CUDAHY, Circuit Judge.
This ease had its origins in the cancellation of a partially completed nuclear power plant — the Marble Hill project in Jefferson County, Indiana. The Marble Hill project was undertaken by Public Service Company of Indiana (now PSI Energy, Inc.) (PSI). Wabash Valley Power Cooperative (Wabash), a generation-and-transmission cooperative serving 24 rural electric membership cooperatives (Members or distribution co-ops) purchased a 17% interest in the project. It borrowed the funds for this purpose with the aid of a loan guarantee from the Rural Electrification Administration (REA). After an expenditure of $2.9 billion, PSI decided to cancel the Marble Hill project in 1984. At that time, Wabash had invested $460 million in the defunct plant. Upon the cancellation, Wabash filed suit against PSI (83% owner of Marble Hill) and the architect-engineer of the project, Sargent and Lundy Engineers (S & L).
At that point the problem was similar to that presented elsewhere by other nuclear plant abandonments or cost overruns. Who pays: the stockholders of an investor-owned utility, the ratepayers of almost any utility or, if there is very little or no equity (as may be the ease with a cooperative utility), the secured and unsecured creditors? For example, in the case of the extremely costly Seabrook Plant, jointly owned by Public Service Company of New Hampshire, the stockholders and ratepayers shared the burden of the company’s bankruptcy. The company obtained a rate increase covering only a fraction of the Seabrook Plant’s cost overruns. In re Public Serv. Co., 114 B.R. 820 (Bankr.D.N.H.1990). In the case of the Shoreham Plant on Long Island (owned by the Long Island Lighting Company), the ratepayers apparently contributed something by way of a series of rate increases to keep the company out of bankruptcy when the plant was decommissioned. Citizens for an Orderly Energy Policy, Inc. v. Cuomo, 159 A.D.2d 141, 559 N.Y.S.2d 381 (1990), aff'd 78 N.Y.2d 398, 576 N.Y.S.2d 185, 582 N.E.2d 568 (1991). In the Duquesne Light Company case, the Pennsylvania Commission allowed amortization over a ten-year period of the sunk costs of certain abandoned nuclear plants, but the Pennsylvania Supreme Court reversed on the grounds that the plants were never used and useful in the public service. Barasch v. Pennsylvania Public Util. Comm’n, 516 Pa. 142, 532 A.2d 325 (1987), aff'd sub nom. Duquesne Light Co. v. Barasch, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). The utility company then appealed to the United States Supreme Court, claiming confiscation, but the Court affirmed, primarily on the ground that the same impact on allowable revenue could have been achieved by a small adjustment in the allowed rate of return on equity. Duquesne Light Co. v. Barasch, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). Following the principle established in Federal Power Comm’n v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), the Court held that the particular route followed in the ratemaking process did not raise constitutional problems so long as the “end result” was fair. Thus, commissions and courts have followed differing paths in accounting for defunct or high-cost nuclear plants.
In the present case, at the time of the Marble Hill cancellation Wabash attempted to restructure its REA indebtedness and, at REA’s insistence, filed for a 51% electric rate increase before the Indiana Utility Regulatory Commission (the IURC) (formerly the Public Service Commission of Indiana). This rate hike was denied based on Citizens Action Coalition, Inc. v. Northern Indiana Public Service Co. (NIPSCO), 485 N.E.2d 610 (Ind.1985), cert. denied, 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687 (1986) which had denied a similar increase to NIPSCO on the grounds that a canceled plant was not “used and useful” in the public service. In re Wabash Valley Power Ass’n, Inc., Cause No. 37472, 1987 WL 257474, 1987 Ind. Puc Lexis 415 (Ind.Pub.Serv.Comm’n 1987). On appeal, the Indiana Supreme Court reaffirmed the principles enunciated in its NIPSCO decision, denying the rate increase on the ground that Marble Hill had never become used and useful in the public service. No *1309 tional Rural Utils. Coop. Fin. Corp. v. Public Serv. Comm’n, 552 N.E.2d 23 (Ind.1990).
Cut off from relief at the hands of Indiana regulators and courts, REA sought to preempt state law and to take the rate increase decision into its own hands. It tried to do this first by a letter directed to Wabash and later by a notice-and-comment rulemaking. These efforts at preemption were rejected by this court, in its decisions in Wabash Valley Power Ass’n v. Rural Electrification Admin., 903 F.2d 445, 452-54 (7th Cir.1990) (Wabash I) and Wabash Valley Power Ass’n v. Rural Electrification Admin., 988 F.2d 1480, 1488-91 (7th Cir.1993) (Wabash II), respectively. It is important to an understanding of the difficult bankruptcy questions involved here that all the efforts of REA to recoup its defaulted loan through a Wabash rate increase have failed and that there appears to be no further recourse in this direction, except arguably for a 4% “viability” increase to finance the reorganization plan approved by the bankruptcy court here.
In this connection, we note that Wabash has 22 Member distribution cooperatives in Indiana, organized as not-for-profit corporations, pursuant to the Indiana Rural Electric Membership Corporation Act, Ind.Code §§ 8-1-13-1 et seq. (1995). Wabash itself was formed under the Indiana Not-For-Profit Corporation Act, Ind.Code §§ 23-7-1-1 et seq. (repealed 1971, similar provisions now at §§ 23-17-1-1 et seq.). As a not-for-profit corporation Wabash cannot pay any earnings or dividends to its members, and upon dissolution any assets remaining after payment of debts escheat to the state. Ind. Code § 23-17-30-1 (1995). Wabash also has one Member cooperative in Michigan and one in Ohio. Each Member is owned and controlled by its customers, retail buyers of electricity. Wabash was formed in 1962 to provide its Members with a rehable and reasonably priced wholesale power supply. Wabash is governed by a Board consisting of one director from each of its 24 Members. Before Wabash began supplying its Members with electric power, the Members received power directly from one of four adjacent investor-owned utilities — PSI, Northern Indiana Public Service Company (NIPSCO), Indianapolis Power and Light Company (IPL) and Indiana & Michigan Electric Company (I & M) (the IOUs).
In 1977, Wabash entered into 40-year wholesale power requirements contracts with its Members (the Supply Contracts) and subsequently took an assignment of the Members’ existing power supply contracts with the adjacent IOU’s. The Supply Contracts provide that (1) Wabash’s rates shall produce revenues sufficient, but no more than sufficient, to pay operating expenses, taxes, etc., and to provide reasonable reserves; (2) rates must be pre-approved by the Wabash Board (which represents the Members); and (3) all rate requests are “subject to the approval” of the Indiana Commission.[1] The IURC requires any excess of Wabash’s revenues over its expenses and replacements to be credited to its Members.
As noted, efforts to restructure the REA indebtedness following the cancellation of Marble Hill were unsuccessful, and in 1985 the United States Department of Justice asserted the possibility of personal liability of the Wabash directors. Shortly thereafter, Wabash filed under Chapter 11 of the Bankruptcy Code. As of the bankruptcy Petition Date, Wabash owed REA approximately $130 million related to non-Marble Hill assets and about $540 million related to Marble Hill for a total of $669,058,454.25 in principal and interest.
Subsequent to the Petition Date, Wabash voluntarily paid REA $36,444,964.22 in non-Marble Hill debt service payments. After June of 1988 Wabash made these debt service payments into an escrow account entitled the Timbers Account. In 1990, pursuant to an order of the bankruptcy court, Wabash paid REA an additional $28,928,693.22 from the Timbers Account. Order Granting United States’ Motion for Abandonment of Mo *1310 nies in Escrow Account, Bankr.Rec.Doc. 6 (hereinafter Timbers Order). As of the Petition Date, Wabash also owed about $35 million to the National Rural Utilities Cooperative Finance Corporation (CFC), of which about $12 million has been paid. The REA debt and most of the CFC debt are secured by a pre-petition joint mortgage and security agreement (REA mortgage) covering most of Wabash’s assets. PSI has also filed certain unsecured claims against Wabash, most of them related to Marble Hill.
A settlement has been reached between Wabash and PSI, contingent upon confirmation of the Wabash Plan (or some other consensual resolution of the bankruptcy ease) (the PSI Settlement). That settlement provides, inter alia, for payments by PSI to REA and to CFC having a present value of $170 million. The PSI Settlement also provides that any plan filed by Wabash shall allow PSI’s “indemnification” claim in the amount of $466,017.00 and that PSI will fore-go payment of its remaining claims. The bankruptcy court found, there being no dispute, that the PSI Settlement was fair and reasonable, and that the payments worth $170 million were contingent on confirmation of the Wabash Plan. A settlement with S & L, to which REA did not object, was also found to be fair and reasonable.
In order to reach an appropriate disposition of the bankruptcy proceeding, the bankruptcy court determined the value of Wabash, both as a going concern and upon liquidation, and evaluated the claims of the secured and unsecured creditors. The court also considered reorganization proposals submitted by both Wabash and REA.
Initially, after a hearing, the bankruptcy court undertook to determine Wabash’s going-concern value. Its decision on this point was, however, remanded by the district court for the taking of further evidence on the prospects of a rate increase for Wabash and also on the question whether such an increase would invalidate the Supply Contracts. National Rural Utils. Coop. Fin. Corp. v. Wabash Valley Power Ass’n, Inc., 111 B.R. 752 (S.D.Ind.1990), rev’g and rem’g 77 B.R. 991 (Bankr.S.D.Ind.1987). Further hearings were held on these issues as well as on the appropriateness of the reorganization plan proposed by REA and the one submitted by Wabash.
The REA Plan was rejected inter alia because it required substantial rate increases — not realistically to be anticipated. In re Wabash Valley Power Ass’n, Findings of Fact and Conclusions of Law on Confirmation of Debtor’s Third Restated Fourth Amended Plan of Reorganization and Denying Confirmation of REA’s Plan, No. 85-2238-RWV-11, slip op. at 145-73 (Bankr.S.D.Ind. August 7, 1991) (hereinafter Bktcy. Op.). The REA Plan provided for full payment (including post-petition and post-confirmation interest) to REA and to CFC over a 37-year period. REA estimated that the debt to it and to CFC totaled $1 billion. Under the REA Plan, REA and CFC were to take control of Wabash and elect its Board of Directors. As discussed infra, this action would presumably breach the Supply Contracts and render them unenforceable. The REA Plan also provided that Wabash might be liquidated at any time, at the discretion of the REA. The bankruptcy court held that the REA Plan violated 11 U.S.C. § 365 because it provided for the partial assumption of the Supply Contracts without giving effect to their express provision recognizing rate regulation by the IURC and without honoring their implied provision requiring Member control of the Wabash Board. Under 11 U.S.C. § 365, an entire contract must be assumed including any burdensome provisions that it may have. See In re Chicago, R.I. & P. Ry. Co., 860 F.2d 267, 272 (7th Cir.1988). In addition, the REA Plan purported to adopt the PSI Settlement, even though that Settlement was contingent on confirmation of the Wabash Plan. REA has not appealed the rejection of its Plan.
The Wabash Plan, Wabash Valley Power Ass’n, Inc.’s Third Restated Fourth Amended Plan of Reorganization, Bankr.Rec.Doc. 154, has been approved by both the bankruptcy court, Bktcy.Op. at 112-45, and the district court, In re Wabash Valley Power Ass’n, No. IP 91-928-C (S.D.Ind. June 28, 1994) (hereinafter Dist.Op.), and is the subject of this appeal by REA. The approval was based primarily on the bankruptcy *1311 court’s findings of fact regarding Wabash’s value in various circumstances. Bktcy.Op. at 16-101.
The stipulated liquidation value of Wabash’s tangible, useful assets is $175 million and of its Marble Hill assets is $29.8 million. The bankruptcy court properly found that the liquidation value of the PSI Settlement was zero because of its contingent nature and its assumption that Wabash would continue to buy power from PSI in the future. The S & L Settlement was also properly found to have zero liquidation value. The bankruptcy court found that the Supply Contracts, under which the Members took power from Wabash, had no value in liquidation. This finding was based in part on the testimony of law professor, Ian MacNeil, that, other than the right to fully-earned payments, Wabash’s rights under these contracts were not assignable nor were Wabash’s principal duties dele-gable. There is thus substantial evidence in the record that the Supply Contracts have no fair market value if Wabash is liquidated. The finding of the bankruptcy court that the total liquidation value of Wabash (valuing the PSI and S & L Settlements, the Supply Contracts and other contract rights at zero) amounts to $213,210,000 is not clearly erroneous. Even giving full value to the PSI and S & L Settlements (a procedure rejected by the bankruptcy court) the total value recoverable by a Wabash trustee on liquidation would be less than $400 million.
The bankruptcy court also determined Wabash’s fair market value as a going concern and thereby fixed the amount of the secured claim held by REA and CFC. Based primarily on Professor MacNeil’s testimony, the bankruptcy court determined that the Supply Contracts would be breached and rendered unenforceable by Wabash if regulatory authority were transferred from the IURC, if the Members lost control over Wabash or if rates in excess of Wabash’s costs were charged. The Contracts themselves provide that the seller of the electricity may not make a profit. They expressly provide that only Wabash’s Board (comprised, according to its Bylaws, of Member representatives) may request a rate change and all rate changes are subject to IURC approval. IURC regulations in turn provide that any excess of revenues over expenses and over a limited reserve must be credited against fuel adjustment charges.
Any transfer of control of Wabash away from the Members would thus nullify their purchase obligation under the Supply Contracts. Once discharged from their purchase obligation under the Supply Contracts, the Members would be free to take their business elsewhere if rates were raised to a profit-creating- level. The Members would be especially inclined to depart since they presently maintain physical connections with the very investor-owned utilities from which Wabash purchases power.[2]
Assuming inability to obtain a rate increase and a need to renegotiate the Supply Contracts in the context of easy access to competitive power from the four adjacent IOUs, Wabash presented testimony as to its going-concern value based on sale to a profit-motivated IOU with the existing customer base of 24 distribution co-ops. The bankruptcy court found that any benefits that an investor-owned utility could realize from acquiring Wabash would be tightly constrained by the need to renegotiate the Supply Contracts.[3] It also found that no prospective *1312 buyers had actually appeared (except PSI and the terms of its offer were not disclosed by REA). Further, there was little prospect of another not-for-profit cooperative seeking to buy Wabash since no such entity could realize an economic benefit from doing so. The testimony, using a cash flow approach and a 10.2% discount rate arrived at a going-concern valuation, and fair market value, of $190,000,000. This value produced a market-to-book ratio that was consistent with ratios of stock value to asset book values of comparable electric utilities. The bankruptcy court found $190 million to be a maximum going-concern and fair market value and that finding is not clearly erroneous.
The value of Wabash to its Members exceeds its value to any third-party buyer because Wabash is tailored exactly to the Members’ requirements. Dr. Wilbur G. Lewellen testified with respect to the total value of Wabash to its Members based on cost savings they realize in buying Wabash power as opposed to direct purchases from the adjacent IOUs. The measurement of the cost savings to the Members of using Wabash involved a study of power costs with and without Wabash. Lewellen used a 13% discount rate as applied to cost savings of $69.4 million and added the debt associated with Wabash’s operating assets to reach a total value to the Members of $221.7 million. The bankruptcy court accepted this testimony and this finding is not clearly erroneous.
According to the bankruptcy court, the $190 million going-concern value represents the amount the secured creditors could expect to receive following a sale of Wabash to a third party as a going concern and satisfies the requirements of 11 U.S.C. § 506(a) and § 1129(b)(2)(A). Using this going-concern value of $190 million, and adding the PSI Settlement of $170 million, the S & L Settlement of $15 million, Marble Hill assets, investment accounts, CFC investments and vehicles, the bankruptcy court arrived at a total value of Wabash’s assets for purposes of 11 U.S.C. § 506(a) and §1129(b) of approximately $431.9 million. Based on this value, REA and CFC were found to be undersecured, with the secured portion of REA’s claim valued at approximately $400 million.
The bankruptcy court found that the value to the Members of $221.7 million was also relevant to the confirmability of the plan because it defined the maximum amount which could possibly be made available to creditors. The Wabash Plan provides for a “viability” rate increase (enabling a reorganization plan to be approved) from the IURC based on this value to the Members. This rate increase will allow Wabash to satisfy a fraction of the unsecured claims, assuring that creditors are receiving the maximum amount possible for purposes of 11 U.S.C. § 1129(b)(2)(B). The bankruptcy court found it reasonable (because of benefit to ratepayers) to expect that the IURC would approve a “viability” rate increase to Wabash. This would enable Wabash to pay $221.7 million to REA and CFC and thereby come out of bankruptcy. Under the Wabash Plan, based on Wabash’s value to its Members, REA is to receive a total of $430,639,-122.00 (including funds from the PSI and S & L Settlements) in addition to the $36.4 million that Wabash voluntarily paid REA after the Petition Date. CFC is to receive $26,-207,506.00 in addition to the $12 million that Wabash voluntarily paid CFC subsequent to the Petition Date. PSI is to receive $466,-017.00 payable in equal installments over five years without interest. The Members’ unsecured claims for patronage capital (totaling $7,184,740.07) are to be reduced to the same extent that the unsecured portions of the claims of REA and CFC are not honored.
The Wabash Plan also provides that Members are to make capital contributions to Wabash of $3,213,346.00 payable in cash or through rates over 12 months. This sum is intended to form a part of the amount allowed as a capital reserve in Wabash’s 1983 rate ease. Article IX of the Wabash Plan contains the essential provision that Wabash is to assume the Supply Contracts with its Members in order to generate the revenues necessary to fund the Plan. This assumption will obligate the Members to fulfill all their obligations under the Contracts and will entitle them to all the benefits of the Contracts *1313 including the right to name Wabash’s Board of Directors. REA and CFC voted to reject the Wabash Plan. PSI, also an impaired creditor, and almost all the Members voted to accept it.
The bankruptcy court found that the Wabash Plan provided the maximum amount that REA and CFC could possibly obtain. It met the requirements of 11 U.S.C. § 1129(b) and was confirmable. All objections to the Wabash Plan were denied and the Wabash Plan was confirmed.
On appeal, REA raises numerous objections to the Wabash Plan. Because the Plan is being affirmed over REA’s objection it must satisfy the requirements for “cram-down.” “Cramdown” is the procedure for approving a reorganization plan in the face of creditor resistance. It requires that at least one class of impaired creditors approve the plan and that the plan satisfy the absolute priority rule, which precludes the payment of junior claims as long as senior claims remain unsatisfied. REA contends on appeal that the Wabash Plan fails to meet these requirements. It also argues that the valuation performed by the bankruptcy court underestimates the value of REA’s secured claim in two respects: first, it offsets the money paid into the Timbers Account against REA’s secured claim, and second, it values the security interest at the going-concern value rather than at the “value to the Members.” We address these issues below, and find, although some close questions are presented, that the Wabash Plan was properly upheld by the district court.

Absolute Priority Rule

The most significant obstacle to confirmation of the Wabash Plan is the question of its compliance with the “absolute priority rule.” As codified for the first time in the Bankruptcy Code, the rule provides that, in order for a bankruptcy plan to be approved in the face of the refusal of an unsecured creditor to accept it (a “cramdown”), the holder of any claim or interest junior to that of the dissenter may not “receive or retain under the plan on account of such junior claim or interest any property.” 11 U.S.C. § 1129(b)(2)(B)(ii).
The rule thus stated has three components: (1) the identification of junior claims or interests; (2) the identification of any property retained by the holders of such claims or interests; and (3) the determination whether the property is retained “on account of’ a junior claim or interest. The term “interest” in this context means equity interest. See, e.g., 5 Collier on Bankruptcy, § 1122.03[3] (15th ed.1994). (“A plan of reorganization must separately classify nonp-riority prepetition unsecured claims, priority claims, secured claims, including secured set-off claims, and equity interests.”).
The difficulty in resolving the absolute priority problem in the case before us primarily reflects the unusual structure of the entities involved. Not one of the players in this drama is typecast. The corporation undergoing bankruptcy is a not-for-profit cooperative. The creditor is not a private lender but a federal agency.
Wabash’s Members are not owners in any usual sense of the term. By design, “in a cooperative association the concept of profit is inappropriate, because profit, in its recognized economic sense, is the wage of the entrepreneur, and in a co-operative there is no entrepreneur.” Emmanuel S. Tyson, Annotation, Co-operative Associations: Rights in Equity Credits or Patronage Dividends, 50 A.L.R.3d 435 (1995). Pursuant to state law and the rules of the co-operative, Wabash Members receive no profits, nor do they have any current or prospective ownership rights in the corporate assets. Under Indiana law any assets remaining to the cooperative after a liquidation or dissolution escheat to the state. Bktcy.Op. at 8, citing Ind.Code §§ 23-7-l.l^l(c), 14(a), and 33(b)(3)(E) (repealed 1991, similar provisions now at §§ 23-17-1-1 et seq.). Indeed, almost the only prerogative Members share with shareholders in an ordinary business corporation is the right to elect a board of directors.
The primary benefit to the members of an electric co-operative accrues to them in their role as customers with access to electric power at favorable rates. These rates, in Wabash’s case, are largely controlled by Indiana regulations and must be approved by state authorities. State law requires that ratepay *1314 ers pay only the cost to produce the electricity they purchase. Cooperatives are arguably able to offer lower rates, primarily because they are so constituted that profit or return to equity is not part of their cost to produce and they can borrow money at low interest rates.
Given all of this, it is small wonder that the rules of Chapter 11 bankruptcy, primarily designed as they are for profit-seeking enterprises, are less than straightforward to apply here.
I. The Absolute Priority Rule—Background
In its origins, the absolute priority rule was a judicial invention designed to preclude the practice in railroad reorganizations of “squeezing out” intermediate unsecured creditors through collusion between secured creditors and stockholders (who were often the same people). Northern P. Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913). See also, e.g., John D. Ayer, Rethinking Absolute Priority after Ahlers, 87 Mich.L.Rev. 963, 969-73 (1989) (discussing the history of the absolute priority rule). The rule was thus devised primarily to deal with a situation of overlapping ownership and creditor interests.
More recently, however, courts have dealt with a second type of overlap—that between owner and manager or employee. Most of these cases seem to involve either farmers or owners of close corporations. See, e.g., Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939); In re Stegall, 865 F.2d 140 (7th Cir.1989); Unruh v. Rushville State Bank, 987 F.2d 1506 (10th Cir.1993); In re Snyder, 967 F.2d 1126 (7th Cir.1992); Kham & Nate’s Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351 (7th Cir.1990). These cases deal with the situation in which an equity owner also performs important functions in running the business—contributing intangibles such as labor, reputation and experience. These owner-managers have, in these and other cases, argued that they should retain an ownership interest in the reorganized corporation, not on account of their past ownership per se, but in exchange for a promise to contribute their labor and managerial skills to the future running of the corporation.
Courts have taken a dim view of such exchanges and the Supreme Court in Ahlers roundly rejected the contention that such contributions may justify the retention of an ownership interest in the face of creditor disapproval. 485 U.S. at 204-05, 108 S.Ct. at 967-68. In rejecting these attempts the courts have cited the difficulty of valuing and enforcing these intangible contributions and have also been reluctant to overrule the creditors’ view that retention of management is not worth what it may cost. 485 U.S. at 204-07, 108 S.Ct. at 967-69; 908 F.2d at 1359-60; 865 F.2d at 142.
At the same time, however, in recognition of the fact that prior owners may sometimes be the best “buyers” of a reorganized corporation, courts are reluctant to squeeze the old owners out entirely. 967 F.2d at 1130. This reluctance is especially evident when the debtor is a closely held corporation or a sole proprietorship. This tension has been a driving force behind the development of the new value “exception” which allows old owners to retain equity if they contribute new value in the form of “money or money’s worth” which is “necessary” to the reorganization and “reasonably equivalent” to the interest they retain. 308 U.S. at 121, 60 S.Ct. at 10; In re Potter Material Serv., Inc., 781 F.2d 99, 101 (7th Cir.1986).
With the codification of the absolute priority rule, the continued validity of the new value exception has been questioned, with some authorities arguing it is no longer valid because it does not appear expressly in the Code. Other decisions simply assume its continued validity as part of the context within which Congress enacted the Bankruptcy Code. Still others have suggested that it is not an exception at all, but simply a concrete example of an interest which is retained not “on account of’ a prior interest but for other reasons. See, e.g., Julie L. Friedberg, Wanted Dead or Alive: The New Value Exception to the Absolute Priority Rule, 66 Temple L.Rev. 893 (1993); Clifford S. Harris, A Rule *1315 Unvanquished: The New Value Exception to the Absolute Priority Rule, 89 Mich.L.Rev. 2803 (1991) (assessing the continued vitality of the new value exception and collecting cases). See also, In re Bonner Mall Partnership, 2 F.3d 899 (9th Cir.1993) (discussing various approaches to the new value exception and upholding its continued validity). The question has béen left open by the Supreme Court and by this circuit, see Kham & Nate’s Shoes, 908 F.2d at 1362 and In re Snyder, 967 F.2d at 1130-31, and there is no need to decide it here.
In an attempt to satisfy the new value exception, the Wabash Plan provides for its Members to contribute $3.2 million to Wabash in new capital (to support ongoing utility operations). The bankruptcy court found that this contribution exceeds the value of any interest the Members might be retaining or receiving under the Plan. The bankruptcy court also found that this contribution qualified the arrangement for invocation of the new value exception. As noted, we will not address this issue here.
The common thread running through cases involving the absolute priority rule is a refusal to allow prior equity owners to trade on their “insider” status to acquire new equity for less than its value. The situation we examine here appears to involve a similar sort of confluence of interests since the Members are both customers and controllers of the corporation. However, our analysis must differ substantially from that followed in many other eases because a member of a non-profit cooperative occupies a position different from that of a stockholder of a business corporation. Because of the way in which the rights of Members of Wabash are constrained both by state law and by the organization’s own bylaws, we believe that the Members may continue in control of the reorganized co-operative without violating the absolute priority rule. Beyond complying with the rule, this outcome also seems to make economic sense, since it maximizes the value available to meet creditor claims.
II. Application of the Absolute Priority Rule to the Wabash Plan
REA contends that the Wabash Plan violates the absolute priority rule in two ways. First, REA argues that certain “patronage capital accounts,” which provide a credit to customers for the amount by which rates exceed fluctuating costs, are not claims, as they are classified in the Wabash Plan, but are, instead, equity interests. REA thus argues that the Members may not, under the absolute priority rule, receive any part of the amounts credited to them. As classified by Wabash, the accounts are claims and are not junior to REA’s unsecured claim. If this classification is correct, they may be paid to the same extent as other unsecured debt. Equity interests, on the other hand, would be subordinate to REA’s unsecured debt, which is not fully paid under the Plan. Payment with respect to equity interests would violate the absolute priority rule. We find, however, that the patronage capital accounts give rise to claims and may be paid as the Wabash Plan prescribes. The Plan contemplates payment of these claims in the same proportion as other unsecured debt is paid.[4]
Second, REA argues that the control over the reorganized cooperative (and thereby over the rates paid by Members) which the Members will exercise by virtue of their continued Board representation is property which the Members “retain on account of’ their prior interests in the organization. We believe, however, that Wabash Members do not hold equity interests in the cooperative. It is therefore impossible for them to retain any property “on account of’ such interests.
A. Patronage Capital
The cooperative Members are classified under the Wabash Plan as holding “claims” for the reimbursement of “patronage capital.” Wabash Plan at §§ 3.11 and 3.12. Because of the difficulty of anticipating exactly what the costs of producing power *1316 will be, utilities sometimes collect excess revenues. State law requires that customers be reimbursed for these overcharges. Ind.Code § 8-1-13-17(d) (1995). Patronage capital is a somewhat misleading term which refers to a portion of this excess revenue which the Wabash Bylaws allow it to retain in order to cover fluctuations in production costs and to make capital expenditures without having first to raise rates and accumulate the necessary funds. Because the Members must eventually be reimbursed for overcharges, however, the “patronage capital” funds are credited to individual cooperative Members in amounts proportional to their purchases of electricity. Wabash Bylaws, Art. VII, Sec. 2. The timing of repayment of these overcharges is left to the discretion of the Wabash Board. Transcript of Confirmation Hearing, Jan. 3, 1990, Testimony of Edward P. Martin, p. 24.
REA argues that these accounts are not claims but rather equity interests junior to REA’s unsecured claims, and that the payment of any portion of these amounts, as envisioned in the Wabash Plan, violates the absolute priority rule. The district court, affirming the bankruptcy court, held, however, that these accounts were correctly classified as claims, the proportionate payment of which under the Wabash Plan is not a violation of the rule. Dist.Op. at 7-10. Although this is an extraordinarily elusive question, we. agree.
' The definition of “claim” under the bankruptcy code is very broad, encompassing any “right to payment, whether or not such right is reduced to judgment, liquidated, unliqui-dated, fixed, contingent, matured, unma-tured, disputed, undisputed, legal, equitable, secured, or unsecured.” 11 U.S.C. § 101(5)(A). Thus the fact that the patronage capital accounts are not payable at a specified time or under specified conditions does not foreclose their treatment as claims for bankruptcy purposes.[5]
In reaching this conclusion we have carefully considered the opinion of the bankruptcy court in In re Eastern Maine Electric Coop., Inc., 125 B.R. 329 (Bankr.D.Me.1991) (In re EMEC), in which a similar issue was presented. The court in that case concluded that patronage capital accounts were not “claims” under the bankruptcy code because “all such claims have one feature in common: there exists or may come to exist a set of facts, capable of proof, that will require the debtor to encounter liability, whether it chooses to do so or not.” Id. at 338 n. 42. The bankruptcy court believed that the patronage capital accounts involved in that case lacked this characteristic because repayment was at the discretion of the board of directors. (In fact, the accounts apparently were due upon dissolution or liquidation of the cooperative in that case.) Primarily on that basis, the court concluded that “allocated patronage capital the directors have not voted to retire remains an ownership interest.” Id. at 339.
In re EMEC is distinguishable because it was decided under Maine law and under different corporate articles and bylaws, but, in any event, we question the apparent basis of the decision. First, we are not persuaded that the apparent absence of a specified date or condition for maturity of the obligation to repay is sufficient to require classification of the patronage capital accounts as ownership interests.[6]
*1317 Because patronage capital accounts are unique to the cooperative scheme, they differ from more commonly encountered forms of corporate debt. However, while they may lack a specified maturity, they do not otherwise evince the usual attributes of equity investment. For example, the amount credited to a Member’s patronage capital account is proportionate to the amount of electricity the Member purchases rather than being the same for all Members (as would be typical of an “ownership” interest). The refund is determined by the amount by which Wabash’s revenues exceed the approved revenue requirement. The sum credited is therefore essentially a rate adjustment.
Second, the characterization of patronage capital accounts in different jurisdictions does not admit of a uniform resolution; instead it is determined by state law and the relevant articles and bylaws as applied to particular cooperative organizations. 68 B.R. at 915; 125 B.R. at 336. See also 50 A.L.R.3d 435 (citing state non-utility cases holding both for and against the proposition that patronage capital accounts constitute a “debt” owed to the Members and cases reaching various results as to the priority of member claims to patronage capital in bankruptcy). In addition, relevant decisions of the state courts involving Wabash and the particulars of the Wabash bylaws both distinguish this case from In re EMEC.
The Indiana statutes governing electric cooperatives do not permit the members to receive or retain ownership interests in the assets of the cooperative. Instead, if a cooperative is dissolved, “any assets remaining after all liabilities or obligations of the corporation have been satisfied or discharged shall pass to and become the property of the state.” Ind.Code § 8-1-13-21 (1995). Neither is the cooperative itself allowed to retain revenues which have been collected in excess of the cost of service. Ind.Code § 8-l-13-17(d) (1995). The seeming inconsistency between the ban on member ownership of cooperative assets and the existence of the patronage capital accounts is most easily resolved if these accounts are viewed as loans or advances by the member to the cooperative to fulfill various corporate needs. Such loans or advances are specifically authorized by Indiana law. Ind.Code § 23-17-7-9 (1995) (similar provisions formerly at § 23-7-1.1-7 (1990)). The reference to patronage capital in the Wabash Bylaws containing the assertion that the accounts “are the property of the members ... furnished by the members as contributions to capital,” is entirely consistent with this analysis. Wabash Bylaws, Art. VII, Sec. 2. This language (“property of the members”) strongly suggests an advance of a determinate amount of money from the Member to the cooperative with a fixed obligation to repay.
Our own analysis of Indiana law aside, the issue whether Wabash’s Members are investors having ownership interests has been decided by the Indiana Supreme Court. In its decision denying a rate increase for the purpose of repaying Marble Hill debt, the Court discussed the status of Wabash’s Members with respect to monies paid for electric service in excess of the “cost of production.” National Rural Utils. Coop. Finance Corp., 552 N.E.2d at 26-27. The Supreme Court found that the cooperative’s Members are not investors because “... the terms of Wabash’s articles of incorporation provide that patrons or owners are not to furnish capital to finance utility plants nor are they to recover profits from utility operations, thus precluding meaningful participation in the utility as investors.” Id. at 27. If Wabash Members are not investors, it is difficult to conclude that they have equity interests.
Under Indiana law, the patronage capital accounts are not equity interests but credits for overpayments for electric service. The district court was therefore correct in concluding that the patronage capital accounts are properly classified as unsecured claims on behalf of the Members and that the partial and proportionate payment of these claims under the Wabash Plan does not violate the absolute priority rule.
B. Control of the Reorganized Cooperative
REA makes another argument that the Wabash Plan violates the absolute priority rule by allowing the Members to retain control of the cooperative through the appointment of representatives to its Board. *1318 The issue is whether this type of control constitutes “property” which is retained “on account of” prior interests of the Members.
The absolute priority rule is an aspect of the requirement that a plan be “fair and equitable.” There is some appearance of unfairness in the Wabash Plan. Wabash’s member distribution cooperatives, whose representatives approved the Marble Hill fiasco, emerge from bankruptcy in the driver’s seat, still paying low rates, and still not paying off the REA debt. This outcome, however, is justified, even dictated, by Wabash’s cooperative structure. The Members, by controlling Wabash, control their own rates, making it possible for them to be served under the 40-year requirements contracts, which are, in turn, Wabash’s most valuable possession.
In addition to its technical compliance with the absolute priority rule, the retention of control by Wabash Members is not as unfair as it might seem, given REA’s role in encouraging investment in nuclear plants.[7] In addition, since Wabash was specifically designed to supply its own Members, their continuation as customers in control of Wabash is a means of maximizing the value of the estate for the benefit of creditors.
1. Control of Wabash is Not an Equity Interest
Non-profit cooperatives are creations of the legislature. Cooperatives are designed explicitly to allow customers to receive the benefits, in the form of lower prices, which might ordinarily accrue to the owners of equity. While it is true that customers “profit” from this arrangement in some rough sense, the statutory scheme specifically rejects the concept that these savings are profits accruing to ownership. The potential for lower prices is simply not an interest cognizable in bankruptcy. Nor, for that matter, are price benefits income for tax purposes. Members join electric cooperatives with the expectation of access to electricity and in anticipation of low rates. But, neither the lower rates themselves nor any refunds of overcharges, which are mandated to avoid the making of a profit, constitute property received on account of an equity interest.
REA cites cases holding that control is property for purposes of the absolute priority rule. See, e.g., Ahlers; In re Stegall; In re Genesee Cement, Inc., 31 B.R. 442 (Bankr.E.D.Mich.1983); In re Pecht, 53 B.R. 768 (Bankr.E.D.Va.1985). These are, however, business corporation cases. In the ordinary commercial context, the prerogatives of equity ownership include not only the right to control corporate decisionmaking but also the right to a share in profits and in the ownership of corporate assets on dissolution. When associated with an equity interest in a business corporation, control contributes to value — hence the premium investors are willing to pay for a controlling interest in a business corporation. Indeed, as recognized by the Supreme Court in Ahlers, control of a profit-making entity in which one holds an equity interest is valuable even “where debts far exceed the current value of assets” because of “the interest in potential future profits of a now-insolvent business.” 485 U.S. at 208, 108 S.Ct. at 969 (dismissing the “no value” argument made by the debtor). Control is not essential to an equity interest, as the existence of non-voting stock demonstrates. A share of profits, however, is essential. Control alone, divorced from any right to share in corporate profits or assets, does not amount to an equity interest.
The mere fact that the Members of Wabash are benefited by Wabash’s operation and might be disadvantaged by its demise also does not give them an “interest” cognizable in bankruptcy. Employees, managers *1319 and customers, among others, always have an interest, in the broadest sense, in a corporation. The factor which distinguishes these parties from stockholders is not “control” per se (managers, after all, have at least a limited control) but the ability to make use of that control to generate profits or to increase their own share of profits.
In re Whittaker Memorial Hospital Ass’n, 149 B.R. 812 (Bankr.E.D.Va.1993) illustrates this point. Whittaker concerned a non-profit hospital. There the bankruptcy court held that the retention of control of the hospital by the same individuals who controlled it prior to bankruptcy did not violate the absolute priority rule since “the present group retaining control over the debtor entity does not give them anything, certainly not a favored position over [the dissenting creditor] .... Clearly there is no distribution to this group and nothing beyond control that passes to it.” Id. at 816. Cf. In re S.A.B.T.C. Townhouse Ass’n, 152 B.R. 1005 (Bankr.M.D.Fla.1993) (precluding members of non-profit cooperative from retaining control of cooperatively owned real estate).
The Whittaker result seems clear since, among other things, the individuals exercising control over that non-profit corporation were not themselves users of its service. In an electric cooperative, on the other hand, each member has two roles. As a participant in control of the cooperative, each member is required by Indiana law and the rules of the organization to keep rates low. In its role as customer, each member benefits to the extent that rates are kept low. This is an inescapable product of the cooperative form, however, and of the identity of users and controllers. This is not exploitation of insider status of the sort the absolute priority rule was designed to prevent.
There is no essential difference between allowing the Whittaker board to remain in control of the hospital and allowing the Members to remain in control of Wabash. The board of a non-profit organization has a fiduciary duty to manage the organization according to the best interests of the population it is intended to serve (in the case of Wabash, the Member-customers). The cooperative structure simply recognizes the obvious fact that the Members themselves can be counted on to take that duty seriously.
2. The Retention of Wabash’s Essential Structure is Not Unfair to REA
REA was and is, of course, fully aware of the identity of Wabash’s Members as (1) controllers of its operations and (2) users of its power. In making loans, REA may be charged with knowledge of Wabash’s structure in the same way that a lender to a business corporation would know that stockholders are not ordinarily liable for the debts of the corporation. To address the problem of Wabash’s structure, REA relied primarily on its security interest in Wabash’s 40-year Supply Contracts with its Members, which were to provide a reliable source of revenue from which Wabash could pay its debt. See Tri-State Generation & Transmission Ass’n v. Shoshone River Power, Inc., 874 F.2d 1346, 1349-50 (10th Cir.1989); United States v. Southwestern Electric Coop., Inc., 869 F.2d 310, 312 (7th Cir.1989) (discussing this REA practice). The principal reason that these contracts did not fulfill this purpose was the refusal of Indiana regulators to recognize Marble Hill as an asset for rate-making purposes. If the issue is whether REA or Wabash’s Members should bear the burden of the Marble Hill debacle, it is not immediately apparent why the Members are more culpable. Presumably, REA, a promoter of nuclear power,[8] knew the risks as well as anyone.
3. The Wabash Plan Makes Economic Sense
REA is by far the biggest unsecured and secured creditor of Wabash. A cramdown of the Wabash Plan over REA’s strenuous opposition is therefore a very serious matter and one requiring the most careful consideration of whether the Plan is fair and equitable to REA. To be weighed in the balance, however, is the fact that the only apparent alternative to a cramdown is liquidation, under which REA’s recovery would be less than under the Wabash Plan. Thus, the bank *1320 ruptcy court found that Wabash has a going-concern value of $190 million, a liquidation value of $213.2 million and a maximum value to Wabash’s Members of $221.7 million. The greater magnitude of the last figure provides a good reason for leaving Wabash’s structure intact. The REA Reorganization Plan, on the other hand, which would have required substantial (and presumably unrealizable) rate increases, was rejected by the bankruptcy court and no appeal has been taken. There is, therefore, no indication that an alternative to the Wabash Plan, other than liquidation, exists. This is a consideration which certainly does not excuse compliance with the absolute priority rule, but it is nonetheless a fact of which we must remain aware.
Under the Wabash Plan, REA is being awarded its share of Wabash’s going-concern value in partial satisfaction of its secured debt. In addition, and extremely important to the economics of the Wabash Plan, REA will also recover a portion of the PSI Settlement, which is only available under the Wabash Plan, and small amounts from other sources. The total amount REA will receive in satisfaction of its secured claim is approximately $400 million. Further, under the Plan, REA is to receive, in partial satisfaction of its unsecured debt, an additional amount representing the value to Wabash’s Members of the cost savings achieved by having Wabash as a supplier of power. Thus REA’s total recovery under the Wabash Plan is $430.6 million and all creditors together will receive approximately $457 million. No non-Member control could squeeze as much out of Wabash as a going concern and considerably less could be realized by liquidation, particularly considering the loss of the PSI Settlement.
III. The Absolute Priority Rule — Conclusion
• In summary, while Wabash’s member cooperatives obtain some economic benefit as customers from their participation on Wabash’s Board, they do not improperly retain property “on account of’ either their patronage capital accounts (which are mere refunds of overpayments) or their control over Wabash. Control of the cooperative provides no opportunity, either currently or in the future, for the Members to obtain profits or any equity in Wabash’s assets and control itself is not an equity interest. Further, control of Wabash’s Board provides the Members with no opportunity to benefit at REA’s expense. Two factors outside the Members’ control have prevented REA from collecting more of its outstanding debt: the non-profit structure of cooperatives and, most important, the fact that the only conceivable source of funds— increased rates — is foreclosed by state law and the prior decisions of this court.

Other Wabash Issues

I. The Plan’s Compliance with 11 U.S.C. § 1129(a)(10)
11 U.S.C. § 1129(a)(10) requires that at least one non-insider impaired class of creditors accept a proposed reorganization plan before it is eligible for cramdown. The bankruptcy court found that the Wabash Plan was accepted by two such classes of creditors — Class 9 (PSI) and Class 11 (Members’ Patronage Capital Claims) — thus fulfilling the requirements of § 1129(a)(10). On appeal, REA objects to these findings. As Wabash points out in reply, these objections were not raised by REA until after the close of the objection period set by the bankruptcy court and the completion of the confirmation hearing. While they were raised in a post-hearing brief, the bankruptcy court apparently considered these objections waived, since it found that “no objections to confirmation were filed under this section.” Bktcy. Op. at 119. REA argues, however, that, since the waiver rule is applied more flexibly in bankruptcy proceedings and the court is required to ascertain whether a plan complies with the cramdown requirements, Everett v. Perez (In re Perez), 30 F.3d 1209, 1213-14 (9th Cir.1994), it may appropriately raise its objections here.[9]
*1321 We need not determine the extent to which REA’s various objections are waived by its failure to raise them in a timely fashion because we find that the Plan properly classifies PSI’s claims separately from those of the other unsecured creditors and there is no clear error in the bankruptcy court’s determination that PSI’s claims are impaired by the Plan.
A debtor in bankruptcy has considerable discretion to classify claims and interests in a chapter 11 reorganization plan. In re Woodbrook Assocs., 19 F.3d 312 (7th Cir.1994). While a debtor may not separately classify claims solely in order to “gerrymander an affirmative vote on reorganization,” claims may be classified separately if “significant disparities exist between the legal rights of the holder[s of the different claims] which render the two claims not substantially similar.” Id at 318. Claims may also be separately classified if there are “good business reasons” to do so or if the claimants have sufficiently different interests in the plan. See In re U.S. Truck Co., 800 F.2d 581, 583-87 (6th Cir.1986); Heartland Fed. Sav. & Loan Ass’n v. Briscoe Enters. (In re Briscoe Enters.), 994 F.2d 1160, 1166-67 (5th Cir.1993), cert. denied — U.S. -, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993). Because the confirmation of this Plan affects PSI’s interests both with respect to its settlement of other litigation between it and Wabash and with respect to its ongoing business relationship with Wabash, its stake in the Wabash reorganization differs significantly enough from that of the other unsecured creditors to warrant the separate classification of its claims. (Indeed, REA apparently recognized this fact since its own proposed reorganization plan also classified PSI’s claims separately.)
We review the determination whether PSI’s claim is impaired for clear error. REA contends that, because PSI agreed to the terms of the PSI Settlement, it cannot remain impaired under the Wabash Plan which is, after all, in accordance with those terms. The PSI Settlement, however, is not a separate agreement entered into by the debtor prior to filing a reorganization plan. Instead, it is inextricably intertwined with and dependent on the reorganization plan. PSI’s recovery under the settlement will depend on whether the Wabash Plan is approved. Thus, this is not a situation in which a claim has been settled prior to confirmation of a reorganization plan and confirmation therefore leaves the parties’ rights unaffected. Cf. 5 Collier on Bankruptcy ¶ 1124.03[1] (15th ed. 1994). The standard for impairment is very lenient and “any alteration of the rights constitutes impairment even if the value of the rights is enhanced.” Id. PSI’s rights are certainly affected by the confirmation of the Wabash Plan. There is thus no clear error in the bankruptcy court’s determination that PSI is an impaired creditor whose acceptance of the Plan fulfills the requirements of § 1129(a)(10).[10]
Because we find that Class 9 (PSI) is impaired under the Wabash Plan we need not decide whether Wabash’s Members are “insiders” whose acceptance of the Plan would not be sufficient to justify a cramdown. Cf. In re EMEC, 125 B.R. at 334-35 (members of retail electric cooperative not insiders for cramdown purposes).
*1322 II. The Deduction of the Prepayments from the Timbers Account from REA’s Secured Claim
REA disputes the deduction from its secured claim of approximately $28 million of debt service paid to it by Wabash during the post-petition period. This payment resulted from an earlier dispute in this case. Wabash initially contested its obligation (and indeed its right under rate regulations) to continue to make payments to REA in service of its non-Marble Hill debt after filing its bankruptcy petition. Because Wabash believed itself relieved of the obligation of servicing its debt during the pendency of the bankruptcy petition, Wabash argued that it was therefore required to reduce its rates rather than to continue to make such payments to REA. While that dispute was under consideration by the bankruptcy court, Wabash made its payments into an escrow account (the Timbers Account). In July 1990 the bankruptcy court ordered the funds turned over to REA as “a payment to reduce the principal of the non-Marble Hill debt.” Timbers Order at 4-5.
The bankruptcy court reasoned that, since rate payments may, in principle, be used to pay for Wabash’s non-Marble Hill debt, it was of no import when those payments were made. “[I]n either case, the members will pay the non-Marble Hill debt through the rates they are charged.” Id. at 5. The court thus concluded that it was pointless to allow Wabash’s rates to be adjusted downward due to the temporary suspension of its obligation to pay the debt, only to be raised again at a later date when the obligation was reimposed. As the bankruptcy court pointed out: “It can make no difference to the Debtor, and little difference to the members, whether the funds are in effect returned to the members through lower rates now or whether the members pay lower rates in the future as a result of application of the funds to the non-Marble Hill debt now.” Id.
Pursuant to the court’s order, Wabash released the money in the Timbers Account to REA and, in its reorganization plan, deducted the payment from REA’s claim. The issue on appeal is whether it was appropriate for REA to deduct this payment from the secured portion of REA’s claim.
A secured creditor is not ordinarily entitled to any “property acquired by the ... debtor after the commencement of the case.” 11 U.S.C. § 552(a) (1995). Post-petition debt payments to an undersecured creditor which are taken from after-acquired property will thus ordinarily be used to reduce the principal amount of the secured debt. See, e.g., In re Maun, 95 B.R. 94 (Bankr.S.D.Ill.1989). There is an exception to this rule that secured creditors are not entitled to after-acquired property. The exception applies if the security agreement specifically provides that the security interest created extends to “proceeds, product, offspring, or profits” of the collateral or to “rents” paid on it. 11 U.S.C. § 552(b) (1995). REA has not argued that the monies in the Timbers Account fall into any of these categories — nor would there seem to be any basis to conclude that they do.[11]
REA also appears to take issue with the fact that the calculation of Wabash’s “going-concern value” was based on projected revenues beginning in 1991 and did not include the revenues already earned and deposited in the Timbers Account. However, the Supreme Court’s decision in United Sav. Ass’n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) generally precludes including as part of a secured claim any value stemming from the debtor’s usé of the collateral during the pendency of the bankruptcy proceedings. All revenues, except for those specifically excepted under § 552(b), as discussed supra, are deemed part of this unavailable “use value.” This holding squarely prohibits the inclusion of the Timbers Account revenues in the going-concern valuation of Wabash. The bankruptcy court thus properly treated these funds as post-petition payments for debt service, to be credited against the secured part of REA’s claim.
*1323 III. The Use of the Going-Concern Value Rather than the Value to the Members in Valuation of REA’s Security Interest
The valuation of a secured claim is a question of fact which can be overturned only if it is clearly erroneous. In re Vitreous Steel Products Co., 911 F.2d 1223, 1233 (7th Cir.1990). Here the bankruptcy court carefully considered extensive expert testimony on the valuation issue. The methods used by the experts on whose testimony the bankruptcy court relied were standard methods for determining fair market value using the “willing buyer/willing seller” framework. This determination of the fair market value was not clearly erroneous.
However, REA also contends that the use of the fair market value rather than the value to the Members in determining the extent of its secured claim is incorrect under 11 U.S.C. § 506(a). REA Reply Br. at 17-18. Under this statute, a secured claim reaches “to the extent of the value of such creditor’s interest in the estate’s interest in such property” as “determined in light of the purpose of the valuation and of the proposed disposition or use” of the property. Courts have differed as to how to value the creditor’s interest pursuant to § 506(a) in those cases where the debtor is to retain the property securing the debt. The issue is whether the “value of such creditor’s interest” is the amount that a creditor could recover through a sale of the assets securing the debt (either separately or as part of a going concern). The alternative standard where there is no sale is that the security interest covers the entire value that the assets retain in the debtor’s hands under the reorganization plan. Most of the cases concern whether the hypothetical costs of selling the assets should be deducted from the secured creditor’s claim even though the debtor intends to retain the property after reorganization. See, e.g., In re Balbus, 933 F.2d 246 (4th Cir.1991); Metrobank v. Trim-ble (In re Trimble), 50 F.3d 530 (8th Cir.1995) (discussing eases). Here, REA contends that, if the Members are to retain control of Wabash, its secured claim must be valued at the “value to the Members” rather than at the value that could be obtained in a hypothetical sale to a third party.
This circuit has yet to resolve this § 506(a) issue, nor need we resolve it here, because REA has waived the argument. In its brief to the district court, in fact, REA freely conceded that “the value of REA’s and CFC’s security interests is the going-concern value of all of Wabash’s assets.” Dist.Ct. Rec.Doc. 7 at 44. Throughout that brief REA assumed without discussion that the “willing buyer/willing seller” model (an approach to determining fair market value) was the correct approach to valuing its claim (although it disputed Wabash’s implementation of the model). Even in its brief to this court, REA states only that “it is anomalous to fix REA’s lien at the lower of Wabash’s value to a third party or to its owners where the plan gives to the owners the property being valued.” Appellant’s Br. at 45. The brief cites neither case law nor statute in support of this statement. Only in its reply brief does REA raise the question whether the valuation approach taken by the bankruptcy court comports with the dictates of § 506(a), citing only one case discussing the issue. Such minimal treatment of the issue is too little, too late. Doe v. Johnson, 52 F.3d 1448, 1457 (7th Cir.1995). The matter is not properly preserved for our consideration. We might add that, in any event, under the Wabash Plan, REA and the other secured creditor, CFC, are in fact awarded the difference between the two valuations in satisfaction of their unsecured claims; thus no inequity results.
IV. Validity of the Rate Realignment Settlements
Finally, REA challenges a provision in the Rate Realignment Settlements, which Wabash negotiated with its Members and with the relevant state regulatory agencies. The challenged provision would go into effect only if the Wabash Plan were not confirmed. Since we uphold confirmation of the Plan, the issue is now moot.
For all the foregoing reasons, the judgment of the district court affirming the approval of the Wabash Plan by the bankruptcy court is
Affirmed.

. The rates charged by Wabash to one of its Member cooperatives (Fruit Belt) are regulated by the Michigan Public Service Commission. A Settlement Agreement with respect to rate design between Wabash, Fruit Belt and the staff of the Michigan Commission was entered into on September 4, 1991.

. Although not developed in the record below, we can take judicial notice that a trend toward competition is running strong in the electric utility industry — which at some point may make it even more difficult to maintain substantial rate differentials between utilities in adjoining service territories. See, e.g., Peter Passell, A Makeover for Electric Utilities: Power Industry, Facing Competition, Struggles With Change, N.Y. Times, Feb. 3, 1995 at D1; Irwin Stelzer, Restructuring the Electric Utility Industry: Further Tentative Thoughts, 7 Electricity Journal 36 (Oct. 1994).

. Because Wabash’s generation of electricity is relatively meager, it serves primarily as a bulk purchasing agent for its Members. The Members presumably bear the expense of coordinating their purchasing efforts through Wabash only because they can reap the benefits of potentially lower rates. Even if the necessary rate increases could have been obtained, the Members would be unlikely to renegotiate the Supply Contracts with a “for-profit Wabash” on any basis allowing more ample recovery by REA. A far likelier scenario, if the Supply Contracts were breached, would have Wabash's member cooperatives sim *1312 ply returning to the practice of direct purchases from the adjacent investor-owned utilities.

. REA contends that, even if the patronage capital accounts are claims, they are junior to REA's unsecured claim. REA Brief at 21, n. 14; 41, n. 27. The only one of its arguments which is relevant here is that patronage capital, whether a claim or an interest, is only payable at dissolution if other creditors are paid in full. The case cited to support this contention is not in point and REA cites no other authority.

. Cases cited by REA which resolve disputes about the redemption of patronage capital accounts upon the bankruptcy of a member are distinguishable. Besides presenting different substantive issues, these cases involve agricultural cooperatives and were decided under the law of states other than Indiana. In re Axvig, 68 B.R. 910 (Bankr.D.N.D.1987); In re FCX, Inc., 853 F.2d 1149 (4th Cir.1988); In re Beck, 96 B.R. 161 (Bankr.C.D.Ill.1988). In re F.L.F. Farmers Coop. Ass’n, 170 F.Supp. 497 (D.N.J.1958), cited by the EMEC court, also involved an agricultural cooperative and was decided under New Jersey law.

. We note that there have been other debt instruments having no maturity date. One of the best known is the English consol, a bond issued without maturity and perpetually outstanding. The total value of these bonds issued and outstanding is not known but it certainly was very substantial. It is true that these bonds regularly paid interest, but their principal never became due and payable (unless they were called). The United States issued consols having no maturity to finance the Panama Canal. These bonds were eventually called. Randolph W. Westerfield & Jeffrey F. Jaffe, Corporate Finance 119 (3d ed. 1990).

. See, e.g., Greensboro Lumber Co. v. Georgia Power Co., 643 F.Supp. 1345, 1360-61 (N.D.Ga.1986), aff'd, 844 F.2d 1538 (11th Cir.1988); Vermont Co-op Refunding 19.5% Hike as PSB Rejects Debt Restructuring, Electric Utility Week, Jan. 24, 1994, Rates & Regulation at 5 (quoting comments of the Vermont Public Service Board regarding REA encouragement of nuclear plant investment by Vermont Electric Cooperative); John Hall & Charlie Chappie, Cajun Electric Cooperative Seeks Bankruptcy Protection, New Orleans Times-Picayune, Dec. 22, 1994, Money Section (quoting Public Service Commission lawyer regarding REA encouragement of nuclear plant investment by Cajun Electric Cooperative); Rep. Richard J. Durbin, Letter to the Editor: Nuclear Plants Fuel a Rural-Electric Nightmare, *1319 N.Y. Times, Sept. 15, 1986, at A14 (citing REA encouragement of nuclear plant investment).

. See note 7, supra.

. REA also contends that it sufficiently raised these objections by virtue of its timely objections to other aspects of the classification scheme, which it claims gave Wabash sufficient notice of the objections. In re Woodbrook Assocs., 19 F.3d 312, 316 (7th Cir.1994). This contention is patently wrong, especially as regards PSI, since the REA’s own proposed confirmation plan classified *1321 PSI exactly the same way as does the Wabash Plan it now opposes.

. REA also suggests that, even if PSI is impaired by the Plan, it is an "artificial impairment" invented solely for the purposes of effectuating a cramdown. See, e.g., Windsor on the River Assocs. v. Balcor Real Estate Fin. (In re Windsor on the River Assocs.), 7 F.3d 127 (8th Cir.1993). Because REA did not raise this objection until after the close of the confirmation hearing, no evidence on this question appears in the record. While it may be true that rules regarding waiver are applied more flexibly in bankruptcy proceedings than in the context of ordinary adversarial litigation, we will not revisit issues, such as the allegedly improper purposes of the debtor, which were impliedly decided by the bankruptcy court. In re Perez, 30 F.3d at 1213-14. A finding of “artificial impairment” requires an inquiry into the purposes of the debt- or which is not appropriately undertaken by a reviewing court when the creditor pressing the argument has failed to develop a record on the issue which we might review. Id. at 1214. See also In re Woodbrook Assocs., 19 F.3d at 318 (rule against artificial classification difficult to apply since it is about the debtor’s purpose).

. REA cites In re Veeco Inv. Co., L.P., 170 B.R. 149 (Bankr.E.D.Mo.1994) in support of its argument. However, In re Veeco concerns a situation in which the secured creditor had a perfected security interest in rents, clearly distinguishing it from the present case.