In re: **GENERAL TEAMSTERS, WAREHOUSEMEN AND HELPERS UNION, LOCAL 890, dba Teamsters Local 890, an unincorporated association, Debtor.**

**Security Farms; El Dorado Farms; Manriquez & Acuna, Inc.; Higashi Farms, Inc.; Pisoni Farms; Freitas Farms; San Ysidro Farms; J.J.C., Inc., Appellants,**

v.

**General Teamsters, Warehousemen and Helpers Union, Local 890, dba Teamsters Local 890, an unincorporated association, Appellee.**

No. 99–17030.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 2001

Filed Sept. 10, 2001

Harry D. Hochman, Pachulski, Stand, Ziehl, Young & Jones, P.C., Los Angeles, California, for the plaintiffs-appellants.

John T. Hansen, Nossaman, Guthner, Knox & Elliott, LLP, San Francisco, California, for the defendant-appellee.

Before: SCHROEDER, Chief Judge, WALLACE and TALLMAN, Circuit Judges.

SCHROEDER, Chief Judge:

Security Farms, Inc., and other Central California growers ("Growers"), all unsecured creditors, seek review of the bankruptcy court's approval of a Chapter 11 reorganization plan submitted by Local 890 of the International Brotherhood of Teamsters ("Local"). The principal issue is whether the Local's international parent union ("International") has an equity interest in the Local by virtue of the provision in the contract between the Local and the International that upon the Local's liquidation, its assets will escheat to the International for two years or until the Local is reorganized. If the provision does indicate an equity interest, then the International would have to provide new value to the Local to prevent its liquidation. *See* 11 U.S.C. § 1129(b)(2)(B)(1993).

There is also an issue as to whether the collective bargaining agreement itself and the future dues owed the Local should be considered as "assets" that would be distributed in a Chapter 7 liquidation. If so, the plan would violate the best interests of the creditor rule codified at 11 U.S.C. § 1129(a)(7)(A)(ii)(1993). The creditors also attack the bankruptcy court's determination that the debtor proposed the plan in good faith.

The bankruptcy court held that the International did not have an equity interest in the not-for-profit debtor that would entitle the International to be treated like a shareholder or equivalent holder of an equity interest in a for-profit corporation. It followed the only circuit court decision involving application of the absolute priority rule to a not-for-profit corporation. *See In re Wabash Valley Power Ass'n,* 72 F.3d 1305 (7th Cir.1995). The district court affirmed, and we agree. The district court also affirmed the bankruptcy court's holding that the plan did not violate the "best interests" rule. We agree as well, because the creditors could not get more on dissolution of the Local than they would get under the proposed reorganization. It was the overall finding of the bankruptcy court, also affirmed by the district court on appeal, that the plan was proposed in good faith. This finding is entitled to deference and there was no clear error. We therefore affirm.

## I. FACTS

The Local led its members in a strike in 1989. Violence ensued during the strike, and Growers sued the Local. The trial court found for Growers, who were awarded damages of $526,692, along with fees of $769,538 and penalties of $70,000. The Local then filed for bankruptcy under Chapter 11 of the bankruptcy code.

In 1995, the bankruptcy court confirmed a reorganization plan proposed by the Local to resolve its financial obligations to Growers and other creditors. Under the plan, the Local was to sell all its equity in real property and its assets or take a reorganization loan in the amount of its equity and assets, and deposit the proceeds in a bank account. The account would then be used by the Local to pay its creditors. The plan also made available to creditors any gain realized by the Local if it sold or refinanced assets in the five years after the plan's confirmation. When the International's lien on the Local's real property was satisfied (the only secured claim), the Local calculated that it would have $307,440 to pay unsecured obligations consisting principally of the damages awarded to Growers.

Growers appealed the bankruptcy court's decision to accept this plan. In particular, Growers averred that the reorganization plan violated their rights as general unsecured creditors because it did not recognize the International or the Local's members as equity holders, and did not treat the Local's collective bargaining agreement and future member dues as assets. Moreover, Growers believed that the reorganization plan was not proposed in good faith because it allowed the Local to continue operating with its financial affairs essentially unchanged without raising member dues to pay creditors.

The district court reviewed Growers' appeal and affirmed the bankruptcy court, finding that none of Growers' legal theories justified reversing the bankruptcy court's balancing of bankruptcy law and labor law principles. Growers then filed this timely appeal.

## II. WHETHER THE INTERNATIONAL HAS AN EQUITY INTEREST IN THE LOCAL

▉ The bankruptcy code establishes a strict priority for satisfaction of obligations of a debtor. 11 U.S.C. § 1129(b)(2)(B). Claims of equity holders are always junior to claims of both secured and unsecured creditors. *See Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1214 (9th Cir.1994). Under the new value exception that this circuit recognizes, an equity holder may retain its interest only if it contributes sufficient new value to ensure successful reorganization. *See Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 121–22, 60 S.Ct. 1, 84 L.Ed. 110 (1939); *Bonner Mall P'ship v. U.S. Bancorp Mortgage Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 907 (9th Cir.1993).

▉ The absolute priority rule is generally applied to for-profit corporations facing bankruptcy, where an equity owner seeks to retain property, often represented by stock. *See, e.g., Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 208, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *N. Pac. Ry. Co. v. Boyd*, 228 U.S. 482, 508, 33 S.Ct. 554, 57 L.Ed. 931 (1913); *see also* John D. Ayer, *Rethinking Absolute Priority After Ahlers*, 87 Mich. L.Rev. 963, 968–71 (1989)(discussing how the goal of limiting collusion between secured creditors and stockholders in private sector railroad ventures gave rise to the absolute priority rule). The only apparent circuit decision to deal directly with the issue of whether entities affiliated with a not-for-profit organization have equity interests for purposes of the absolute priority rule held that they did not because the essence of an equity interest was an ownership or an interest in the organization's profit. *See Wabash*, 72 F.3d at 1318–19.

In *Wabash*, the Seventh Circuit considered the situation of the Wabash Valley Power Association, a not-for-profit electricity-generating cooperative controlled by members who were themselves electric utility cooperatives. The Wabash cooperative filed for bankruptcy after an ill-fated investment in nuclear power. A creditor then claimed that Wabash's reorganization plan violated the absolute priority rule in part because it allowed Wabash's members to retain control of it. The court held that compliance with the absolute priority rule depended on whether the members held an equity interest, and whether they retained property in the cooperative because of that interest. *Id.* at 1313. The court held they did not because members of the not-for-profit cooperative could not use whatever control they had over the utility cooperative to generate present or future profits from it and the members did not have an ownership interest in corporate assets. Where control does not convey the ability to make commercial decisions that gener-

ate profits or corporate ownership, there is no property retained on account of an equity interest and therefore no absolute priority problem. *Id.* at 1318–19. Since the cooperative's members had no equity interest, the plan did not violate the absolute priority rule.

Growers attempt to distinguish *Wabash* on three principal grounds. First, they contend that local unions are really subdivisions of the parent national or international organizations and are therefore unlike the independent electric utility cooperatives that banded together to create the electricity generating association in *Wabash.*

 It is true that local unions are generally required to abide by the national organization's constitution. *See* William M. Leiserson, *American Trade Union Democracy* 87 (1959); Myron Roomkin, *Union Structure, Internal Control, and Strike Activity* 29 Indus. & Lab. Rel. Rev. 198, 199 (1976). It does not follow, however, that the International controls the Local or profits from it, so that bankruptcy laws should regard the International as an owner that can be forced to choose between making contributions sufficient to sustain the Local or causing the Local to be liquidated. Such a choice makes eminent good sense in the context of a for-profit corporation in bankruptcy. Such a corporation's equity owners should be required to choose between contributing value or forcing liquidation of their interest in a commercial venture. This is because the equity owners' only concern is with the profitability of the corporation, and the decision is purely an economic one. This is what the Seventh Circuit recognized in *Wabash.* 72 F.3d at 1318 ("When associated with an equity interest in a business corporation, control contributes to value—hence the premium investors are willing to

pay for a controlling interest in a business corporation.").

In the labor relations context, the absolute priority rule makes even less sense than it did in the electric utility context in *Wabash.* Labor unions are governed by a unique set of labor relations laws that are designed in large measure to insure that the workers are represented by the collective bargaining representative of their choice. The National Labor Relations Act ("NLRA") provides in part:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . .

29 U.S.C. § 157 (1998).

Thus workers' freedom to choose a bargaining representative depends on the independence of a local from the international union with which it is affiliated. *See NLRB v. Gen. Elec. Co.,* 418 F.2d 736, 755 (2nd Cir.1969). The Second Circuit there held that the NLRA commands that bargaining representation chosen by the workers be exclusive, and that the failure to distinguish between local and international unions undermines that goal. If the International were to be regarded as an equity owner as Growers contend, then the International's unwillingness or inability to contribute a sufficient value to ensure the Local's reorganization would force the liquidation of the Local. This would in turn destroy the federally protected rights of the workers represented by the Local in the collective bargaining process.

It is therefore not helpful for Growers to argue that the International would take over the collective bargaining role formerly held by the union; federal labor law has steadfastly recognized the separation of

the International from its local affiliate. *See United Mine Workers v. Coronado Coal Co.,* 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922); *Coronado Coal Co. v. United Mine Workers,* 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963 (1925); *see also In re Int'l Bhd. of Elec. Workers,* 121 N.L.R.B. 143, 146–47 (1958)(holding that an international union's constitution regulating the local did not make the local into a "mere branch" of the international union). The two entities are distinct even if they have senior officials in common. *Whisper Soft Mills, Inc. v. NLRB,* 754 F.2d 1381, 1385 n. 4 (9th Cir.1984) ("That members of the Council's bargaining committee had formal ties to the [International] is irrelevant."). The fact that the two entities share many goals and bear responsibilities to each other does not imply that all their goals are shared, or that the international union owns the local one. *United States v. Int'l Union of Petroleum & Indus. Workers,* 870 F.2d 1450, 1454 (9th Cir.1989)("[I]nternational and local unions are frequently in adversarial positions. They often engage in lawsuits, internal protests, and complaint proceedings against one another.").

■ As a consequence of this distinction between local and international unions, the Local is financially independent. Its ability to collect member dues does not arise from its affiliation with the International, even if the funds that the Local pays to the International come from member dues. *See Int'l Bhd. of Elec. Workers v. Foust,* 442 U.S. 42, 50–51, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979). Similarly, the International is not financially responsible for local union activities, except to the extent specified in a contract or other limited circumstances consistent with the labor laws. *See e.g., United States v. Dist. Council United Bhd. of Carpenters & Joiners,* 778 F.Supp. 738,

757–58 (S.D.N.Y.1991)(imposing civil RICO liability on international union for corrupt activities in local). *But see* Note, *Collective Institutional Guilt: The Emergence of International Unions' RICO Liability for Local Union Crimes,* 21 Am. J.Crim. L. 291 (1994), (arguing against RICO liability of international unions for local union offenses because such liability conflicts with premises of federal labor law). *See also Shimman v. Frank,* 625 F.2d 80, 97–99 (6th Cir.1980) (holding that unless the international union authorizes or encourages illegal local union activity, the international union cannot be held liable), overruled on other grounds by *Shimman v. Int'l Union of Operating Eng'rs, Local 18,* 744 F.2d 1226 (6th Cir.1984) (en banc).

■ Growers also stress that the International's constitution, which governs the Local, contains escheat provisions covering the Local's assets. The International's constitution provides in relevant part that upon dissolution or disaffiliation, the Local's assets:

> shall likewise be turned over to the General President [or the International] or his representative ... to be held until such time as the subordinate body may be reinstated or reorganized. If no reinstatement or reorganization occurs within a period of two (2) years such funds shall be transferred to the general fund.

Constitution of the International Brotherhood of Teamsters, Art. X, Sec. 13. Growers rely on this provision due to the *Wabash* holding that the members of the cooperative had no prospective ownership rights in corporate assets because under Indiana law the assets would escheat to the state upon liquidation. *See Wabash,* 72 F.3d at 1309, 1313, 1317. Under the International's constitution in this case, the International would take possession of the Local's assets upon the Local's liqui-

dation, but the International would be required to keep these assets segregated from its general fund for a period of at least two years. After two years, however, the International could transfer those assets to its general fund. Thus, the International does have a type of ownership interest, but it is a highly conditional, future interest.

In *Wabash,* the Seventh Circuit identified three components of an equity interest: control, profit share, and ownership of corporate assets. *Id.* at 1318. In *Wabash,* the only component present was control. Here, the International does not have control over the operations of the Local or any type of profit share in the Local because, as explained above, the Local is financially and legally independent of the International. While control in the absence of profit share and ownership of corporate assets does not rise to an equity interest, the Supreme Court has rejected the theory that a profit share or ownership interest may be disregarded simply because it has no present value. *Ahlers,* 485 U.S. at 207–08, 108 S.Ct. 963. In addition the Court has explained that, "the relevant legislative history suggests that Congress' meaning was quite broad. 'Property includes both tangible and intangible property.'" *Id.* at 208, 108 S.Ct. 963.

In *Ahlers,* the debtors sought to keep their ownership interest in their bankrupt family farm. *Id.* at 199, 108 S.Ct. 963. The bankrupt farmers attempted to come within the new value exception by contributing "labor, experience, and expertise" to the farm. *Id.* at 201, 108 S.Ct. 963 (internal quotation marks omitted). Had the debtors prevailed in their argument, they would have enjoyed immediate possession of the farm, a right to all future profits, and control over farm operations. Here, the possibility that the International will come into unfettered possession of the Local's assets is remote at best. In addition, we must take into account the labor law

context in which the International's escheat rights operate. It is clear from the text of the International's constitution that the primary purpose of these escheat rights is to preserve the Local's assets to facilitate a reorganization of the Local within two years.

Because the particular escheat provision in the constitution does not create any immediate ownership by the International in the Local, and because there are no other indicia of ownership by the International, we hold that the International has no ownership interest in the assets of the Local for purposes of the absolute priority rule. We need not decide whether the policy of the NLRA to protect workers' rights to be represented by their chosen representatives would override the operation of the absolute priority rule in the event that sufficient indicia of ownership were present.

 Neither are we persuaded by Growers' contention that, unlike the members of the Wabash cooperative, the Local's members should be considered its owners. The Local's members have a right to set the amount of their union dues, and the Local has a fiduciary responsibility to use the dues for the members' benefit. *See* 29 U.S.C. § 411(a)(3)(1998)(allowing members to set the amount of their dues); 29 U.S.C. § 501(a)(1998)(requiring union locals to spend dues to benefit members). Yet the members have even less control over the Local than did the members of the Wabash cooperative who were found not to have an equity interest. *See Wabash,* 72 F.3d at 1318. The members cannot share in any profits from the Local or control its assets. On the contrary: once dues are paid, they become the property of the local union. *See Air Transp. Ass'n v. Prof'l Air Traffic Controllers Org. (PATCO) (In re Prof'l Air Traffic Controllers Org. (PATCO)),* 724 F.2d 205, 209 (D.C.Cir.1984).

## III. REORGANIZATION IN THE "BEST INTERESTS" OF THE CREDITORS

 Growers also contend that the reorganization plan violates the best interests of the creditor rule, requiring impaired creditors to receive at least as much under a Chapter 11 reorganization plan as they would under a Chapter 7 liquidation of the debtor. 11 U.S.C. § 1129(a)(7)(A)(ii)(1993). Growers contend that if there were a Chapter 7 liquidation, additional assets would be available for distribution: the Local's right to represent workers and its right to collect future dues.

Were the Local to be liquidated, however, there would be no distribution to Growers, because the NLRA prevents collective representation rights from being transferred without worker approval and requires the chosen bargaining representative to use dues solely for the members' and the labor organization's benefit. *See* 29 U.S.C. § 157 (1998)(conferring on workers the right to bargain collectively "through representatives of their own choosing"); 29 U.S.C. § 501(a)(1998)(requiring bargaining representatives to hold money and property exclusively "for the benefit of the [labor] organization and its members"). Thus the local union's collective bargaining agreement and its right to collect future member dues could not be liquidated to pay off creditors. *See NLRB v. Fin. Inst. Employees Local 1182*, 475 U.S. 192, 202–03, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986)(holding that labor law prohibits the assignment or transfer of a collective bargaining agreement against the wishes of the workers for whom the agreement provides representation).

## IV. GOOD FAITH

 Finally, the bankruptcy court did not clearly err in finding that the reorganization plan was proposed in good faith. A plan proposed in good faith is defined as one that satisfies the purposes of the bankruptcy code. *Ryan v. Loui (In re Corey)*, 892 F.2d 829, 835 (9th Cir.1989). Those purposes of the bankruptcy code include facilitating the successful rehabilitation of the debtor, and maximizing the value of the bankruptcy estate. *In re Capital West Investors*, 186 B.R. 497, 499 (N.D.Cal.1995). In the bankruptcy court's view, the plan represented the Local's honest effort to satisfy the demands of its creditors, including the demands of Growers that the Local satisfy the judgment arising from the strike-related violence. We review that determination for clear error. *Mortgage Mart, Inc. v. Rechnitzer (In re Chisum)*, 847 F.2d 597, 600 (9th Cir.1988); *Downey Sav. & Loan Ass'n v. Metz (In re Metz)*, 820 F.2d 1495, 1497 (9th Cir.1987). There was none. Growers argue that the reorganization plan was not proposed in good faith because it allows the Local to retain all its assets and does not require an increase in member dues. Growers contend that, instead, the Local should have raised dues on its members and severed its ties to the International in order to increase the assets available to pay off creditors. The Local did, however, assume additional debt in the amount of its equity in real and tangible property. Its decision not to seek a dues increase was justified because its members who have the exclusive right to set dues amounts under 29 U.S.C. § 411(a)(3)(1998), had already rejected such a dues increase. Its decision to continue its affiliation with the International was reasonable in light of the access to strike funds and other benefits members would receive from the affiliation.

AFFIRMED.