# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-2780

IN RE:

UAL CORPORATION, *et al.*,
Reorganized Debtors.

APPEAL OF:

UNITED RETIRED PILOTS BENEFIT
PROTECTION ASSOCIATION.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 844—**John W. Darrah**, *Judge*.

ARGUED SEPTEMBER 26, 2006—DECIDED OCTOBER 25, 2006

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges*.

POSNER, *Circuit Judge*. United Airlines and its affiliates ("United" for short) declared bankruptcy in December 2002, and in January 2006 the bankruptcy court in Chicago entered a final order confirming a plan of reorganization under Chapter 11. An association of retired United pilots appealed the order to the district court, which dismissed the appeal on the ground that it was unripe. *In re UAL Corp.*, No. 06 C 844 (N.D. Ill. June 22, 2006). The

association (which we'll refer to as the "retired pilots") appeals the dismissal.

The background to this offshoot of United's Chapter 11 proceeding is described in our decision of last March in *In re UAL Corp. (URPBPA)*, 443 F.3d 565 (7th Cir. 2006), which we'll call *URPBPA I* and summarize briefly before moving to the particulars of the present case. United had a collective bargaining agreement with its pilots' union, the Air Line Pilots Association (ALPA), that among other things established a defined-benefit pension plan for both active and retired United pilots. Sometime after entering Chapter 11 bankruptcy, United invoked section 1113 of the Bankruptcy Code, which permits the debtor to repudiate the unexecuted portion of a collective bargaining agreement with the approval of the bankruptcy judge after negotiations between the debtor and the union aimed at modifying the agreement. When ALPA made clear that it would not represent the interests of the retired pilots in the negotiations, the latter moved the bankruptcy judge to appoint a representative to participate in the negotiations on their behalf. The judge refused, and as a result the retired pilots did not participate in the negotiations. We upheld the judge's refusal.

The negotiations resulted in an agreement (called the "Letter Agreement") to modify the collective bargaining agreement by eliminating the defined-benefit pension plan but compensating the active pilots with replacement benefits consisting of convertible notes valued at $550 million and other consideration, including a defined-contribution pension plan. In return, the union agreed not to oppose United's terminating the existing pension plan. United asked the bankruptcy judge to approve the Letter Agreement, pursuant to section 363(b)(1) of the Bankruptcy

Code, which requires the bankruptcy judge's approval for contracts made by the debtor that are outside the ordinary course of business, as the Letter Agreement obviously was. See 11 U.S.C. § 1108. The judge gave his approval over the objection of the retired pilots, who again maintained that he should have allowed them to participate in the negotiations; such participation might, they argued, have resulted in their receiving replacement benefits too. But, also in *URPBPA I*, we approved the judge's action.

As matters developed, United did not press for voluntary termination of the pilots' pension plan. Instead the Pension Benefit Guaranty Corporation, which insures vested rights created by ERISA pension plans, 29 U.S.C. § 1322(a); *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 637-38 (1990), moved under 29 U.S.C. § 1342 for involuntary termination of the plan. PBGC feared that the plan, if it wasn't terminated and so continued generating new vested pension rights, would go into default and as the insurer PBGC would face a staggering liability. The district court granted PBGC's application in an order that we affirm today. *In re UAL Corp.*, No. 06-2662 (7th Cir. Oct. 25, 2006).

The collective bargaining agreement had granted the pilots supplemental retirement benefits, which PBGC does not insure. The termination of the pension plan extinguished the claims against United that the pilots derived from the plan, replacing them with insurance claims against PBGC. But the supplemental benefits remained as unsecured claims against the debtor's estate, along with medical benefits to which other agreements, also terminated by United, entitled them. The active pilots gave up what would have been their unsecured claims to these benefits in exchange for the replacement benefits; the retired pilots did not, because they got no replacement benefits.

In upholding the bankruptcy judge's approval of the Letter Agreement, we noted in *URPBPA I* that even if the retired pilots had been parties to the negotiations that resulted in the agreement, they would have been bound to receive less in the way of replacement benefits than the active pilots and indeed might well have received nothing. They lost less from the termination of the pension plan, because a retired pilot will have enjoyed the benefit of full pension payments since his retirement while an active pilot who is near retirement will have been contributing to the pension plan for many years without receiving any benefits. The active pilots also had a stick to use against United—the threat of a strike—that the retirees didn't have, and besides surrendering the stick they agreed to substantial salary cuts, a concession that retired pilots could not offer. Such differences justify different treatment of creditors in bankruptcy. *In re Wabash Valley Power Ass'n*, 72 F.3d 1305, 1321 (7th Cir. 1995); *In re Dow Corning Corp.*, 280 F.3d 648, 661 (6th Cir. 2002); *In re Briscoe Enterprises, Inc.*, 994 F.2d 1160, 1167 (5th Cir. 1993); *In re U.S. Truck Co.*, 800 F.2d 581, 582-87 (6th Cir. 1986). But the retired pilots received not merely lower replacement benefits than the active pilots; they received no replacement benefits.

They had no *right* to anything, however, as we explained in *URPBPA I*. Parties to a contract are always free to modify their contract without considering the views of third parties, and United and ALPA were the only parties to the collective bargaining agreement. A union's duty to bargain collectively on behalf of the members of the bargaining unit that the union represents does not extend to retired workers, because they are not members of the unit. *Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 166, 182 n. 20 (1971). And only "interested parties" may participate in a hearing on the

debtor's proposal to reject a collective bargaining agreement, 11 U.S.C. § 1113(d)(1), which means only the parties to the agreement or a guarantor of it, *In re UAL Corp. (IFS)*, 408 F.3d 847, 851 (7th Cir. 2005), and thus excluded the retired pilots. Since, however, the rejection of the collective bargaining agreement had to be approved by the bankruptcy judge, it is possible that had the retired pilots been parties to the negotiations leading up to the Letter Agreement they would have been able to extract *something* from United in exchange for agreeing not to oppose the termination of the pension plans. They might, in short, have obtained some modest replacement benefits of their own. Even if, as we doubted (because had United wanted to do business with the retired pilots it could have done so whether or not they were formally represented in the negotiations), this possibility should have led the bankruptcy judge to require that the retired pilots be admitted to the negotiations that resulted in the Letter Agreement, we thought it far too late to rescind the agreement and send the parties back to square one. And we thought it wholly unrealistic to remand the case to the bankruptcy judge for him to determine what he would have insisted that the retired pilots receive in the agreement as a condition of his approving it. There would be no objective basis for calculating what the retired pilots might have received in a hypothetical negotiation for giving up their opposition and what, therefore, the bankruptcy judge might reasonably have insisted that they receive as a condition of his approval.

All this is by way of background, but indispensable background, to the present controversy. Remember that the retired pilots' claims to pension benefits insured by PBGC were transmuted into claims against PBGC, but that their claims to supplemental benefits (also to certain medical benefits) survived as unsecured claims in the bankruptcy

proceeding. In the plan of reorganization adopted by the bankruptcy court last January, these claims were placed in a separate class from the claims of United's other unsecured creditors. The plan provided that this class would receive between 4 and 8 cents on the dollar. The parties, illustrating lawyers' typical insouciance about quantification, have not told us what the retired pilots' unsecured claims are likely to be worth. But URPBPA's estimate is that its members' supplemental benefits amount to $340 million, and since roughly 57 percent of the retired pilots belong to URPBPA, the total supplemental benefits are probably around $600 million, implying a payout range between $24 and $48 million. The plan of reorganization also incorporated the terms of the Letter Agreement, which gave the active pilots upwards (how far upwards has never been calculated) of $550 million, and their right to that money is preserved in the settlement agreement between United and PBGC. The difference between the payouts to the two groups of pilots is an order of magnitude, though this is misleading since the active pilots made substantial salary concessions in exchange for their $550 million in notes. (Of course, without the concessions, United might have liquidated, leaving the pilots with no salaries.)

The retired pilots claim that they are entitled to benefits proportionately equal to those of the active pilots, and since retired pilots had entitlements to two-thirds of the pension benefits when the plans were terminated, they want the plan of reorganization revised to give them more than $1 billion. The bankruptcy judge turned them down, and they appealed to the district court, which dismissed the appeal (in three sentences) as "unripe" because, the district judge erroneously believed, the pension plans had not yet been terminated. Quite apart from his error, there is no doctrine of appellate "ripeness." "Finality, not ripeness, is the

doctrine governing appeals from district court to court of appeals." *United States v. Jose*, 519 U.S. 54, 57 (1996) (per curiam). Of course events *after* a notice of appeal is filed can affect the appeal—for example by rendering it moot. E.g., *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992); *Diffenderfer v. Central Baptist Church*, 404 U.S. 412, 414-15 (1972); *Golden v. Zwickler*, 394 U.S. 103, 108-10 (1969). But the filing of the appeal cannot be delayed beyond the time (usually 30 days, but 10 days in a bankruptcy case, Fed. R. Bankr. P. 8002(a), though extensions are possible, Fed. R. Bankr. P. 8002(c)) specified for appealing just because, though the order to be appealed from is final, the appellate court's consideration might be better informed or yield a more definitive result if the appeal could be delayed. *United States v. Jose*, *supra*. The appellate court can, if need be, stay appellate proceedings; that is common. But it would be chaos if the filing of the appeal could be delayed indefinitely by "ripeness" considerations; it would lead to endless disputes over the timeliness of appeals. But rather than send the case back to the district court for review on the merits, we shall skip that stage and resolve the merits, which have been fully briefed by the parties, ourselves. E.g., *In re UAL Corp.*, 411 F.3d 818, 821 (7th Cir. 2005); *Ross v. Marshall*, 426 F.3d 745, 761 n. 68 (5th Cir. 2005); *Tilley v. TJX Companies, Inc.*, 345 F.3d 34, 39 (1st Cir. 2003).

The retired pilots' claim is fantastic, as should be apparent from our narrative. It also comes too late. The reorganization has been carried into effect, and no stay was sought or granted. It is true that the financial institutions that provided United with the money it needed to emerge from bankruptcy as a going concern were on notice of the retired pilots' challenge, and that they could in principle have protected themselves in advance from the possibility that the challenge would burden the reorganized corporation

with a further $1 billion or more debt by charging higher interest rates. But the higher those rates, the less likely the reorganization would be to succeed. And predicting the outcome of litigation is very difficult. Therefore institutions that engage in the inherently risky practice of "exit" financing of Chapter 11 bankrupts should have reasonable assurance that once approved the plan of reorganization will not, unless stayed, be rescinded or modified in order to accommodate a very large, very late-appearing debtor, as the retired pilots would be if they succeeded in this appeal. Although the plan of reorganization is based in part on a business model in which United emerges from bankruptcy with a $1.35 billion equity cushion (that is, a value $1.35 billion greater than the aggregate value of the securities issued to its creditors), the company remains fragile and a $1 billion hit could send it spinning, to the detriment of the creditors who consented to the plan.

No exact rule can be laid down to govern challenges to an approved plan of reorganization. A sensible result depends on the strength of the late-appearing debtor's claim, its size relative to the debtor's assets, the reason a stay was denied or not sought, how far the plan of reorganization has been executed, and whether the claim can be satisfied by reducing the claim of creditors who had not provided exit financing. *In re UNR Industries, Inc.* 20 F.3d 766 (7th Cir. 1994); *In re Andreuccetti*, 975 F.2d 413, 415, 417-19 (7th Cir. 1992); *In re U.S. Airways Group, Inc.*, 369 F.3d 806 (4th Cir. 2004); *In re U.S. Brass Corp.*, 169 F.3d 957 (5th Cir. 1999); *In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996) (en banc). Despite the size of the retired pilots' claim, they have made no effort to explore and perhaps dispel the obvious difficulties with granting relief at this stage.

In any event, as we said, the claim is fantastic. It is true that arbitrary differences in the treatment of creditors in

bankruptcy are improper. So when creditors are placed in separate classes in the sense of receiving different percentages of their claims, the differences in treatment must be justified. *In re Boston Post Road Limited Partnership*, 21 F.3d 477, 478-79, 481-83 (2d Cir. 1994); *In re Bryson Properties, XVIII*, 961 F.2d 496, 502 (4th Cir. 1992); *In re Greystone III Joint Venture*, 995 F.2d 1274, 1280-81 (5th Cir. 1991). And the fact that the active pilots' "take" from the reorganization comes in the form of approval of the Letter Agreement rather than placing them in a favored class of unsecured creditors could be disregarded as a merely formal matter. Cf. *In re Spong*, 661 F.2d 6, 9-10 (2d Cir. 1981). But to suggest that the retired pilots are entitled to parity with the active ones is to seek a belated reargument of our decision in *URPBPA I*. The bankruptcy judge approved the deal that gave the active pilots $550 million plus (but also and critically minus, because of the salary cuts that the pilots accepted) in exchange for surrendering the leverage that they enjoyed—United needs pilots to fly its planes. The retired pilots, alas, did not have any leverage at all, or at least so little that, as we said in our previous opinion, no objective quantification was possible. We said that more than six months ago, and if we were wrong the retired pilots have had plenty of time in which to generate some plausible, and at least minimally objective, estimate of what they might have obtained in the way of replacement benefits had they been admitted to the negotiations. In the present state of the record the best answer is zero.

They argue separately that the plan should not have included a clause exculpating ALPA for liability for acts done in relation to the reorganization, notably negotiating the Letter Agreement with no regard for the interests of the retired pilots. But as ALPA had no legal duty to the retired pilots (as we explained in our previous opinion,

and repeated briefly in this one), there is no wrong to be excused; the validity of the clause is academic.

The district court's dismissal of the appeal from the bankruptcy court is vacated and the bankruptcy court's order approving the plan of reorganization is remanded to the district court with instructions to affirm it.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*