# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-1666, 10-1915

COMMODITY FUTURES TRADING COMMISSION,

*Plaintiff*,

*v.*

LAKE SHORE ASSET MANAGEMENT LTD., *et al*.,

*Defendants*.

ANDORRA BANK AGRICOL RIEG, S.A. and
GAMAG BLACK & WHITE, LTD.,

*Appellants*,

*v.*

ROBB EVANS & ASSOCIATES, LLC,

*Appellee*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 3598—**Blanche M. Manning**, *Judge*.

ARGUED OCTOBER 1, 2010—DECIDED MAY 11, 2011

Before POSNER, KANNE, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*.  In 2007 and 2008 the Commodity Futures Trading Commission sued Lake Shore Asset Management and other operators of commodity trading pools, all controlled by Philip J. Baker, for fraud and related violations of the Commodity Exchange Act. After proceedings described in our two previous opinions, see 496 F.3d 769 (7th Cir. 2007), and 511 F.3d 762 (7th Cir. 2007), the district court entered a default judgment against the remaining two defendants (which we'll refer to jointly as Lake Shore). Lake Shore's considerable remaining assets ($104 million—39 percent of the amount Lake Shore owed the investors in the pools), were placed in the control of a receiver, Robb Evans & Associates, appointed by the district court.

The receiver asked the district judge to approve its proposed allocation of the seized assets among the investors. The proposal excluded as untimely the claim filed by an Andorran bank known as Andbanc. The district judge rejected Andbanc's request to be allowed to file an untimely claim, and Andbanc appeals. We have jurisdiction under 28 U.S.C. § 1291 because the judge's order completely disposed of Andbanc's claim and there would be no benefit to Andbanc from appealing after the receiver's proposed allocation was approved and executed. See *St. Louis & San Francisco R.R. v. Spiller*, 274 U.S. 304, 314-16 (1927); *SEC v. Enterprise Trust Co.*, 559 F.3d 649, 651-52 (7th Cir. 2009); *Callahan v. Moneta Capital Corp.*, 415 F.3d 114, 120 (1st Cir. 2005); *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986).

Ten days later the judge approved the receiver's proposed allocation and at the same time denied the objection of another investor, GAMAG, which had an allowed claim but placed a higher value on it than the receiver had. GAMAG has appealed the denial of its objection to the receiver's valuation. Both orders challenged in these consolidated appeals were entered without an evidentiary hearing, so we construe any factual disputes in favor of the appellants.

Andorra is a minute principality in the Pyrenees (180 square miles, population less than 90,000), wedged between France and Spain (each country supplies one of the two co-princes who are the nominal rulers of Andorra, today a parliamentary democracy). It is of ancient lineage, having been created by Charlemagne as a buffer against Moorish invasions of France—and more to the point it's a financial haven, like many other tiny nations. Andbanc, one of Andorra's five banks, is privately owned, provides a variety of sophisticated financial services, and has total assets of more than €8 billion. It had invested some $7.5 million on its own account (rather than on a customer's account) in Lake Shore's commodity pool in 2006, the year before Lake Shore collapsed. It says the receiver should have allowed it a claim for $6.7 million (based on the receiver's method of calculating claims filed by Lake Shore's creditors). That would have resulted in its receiving $2.6 million, because the assets of the commodity pool were, as we said, sufficient to pay the creditors 39 cents on the dollar.

The bank, after making its investment in the commodity pool, had not received regular account statements from Lake Shore, but instead would review its account from time to time on Lake Shore's website. The website was taken down, however, in October 2007; and Andbanc, alarmed, called Lake Shore and learned that it was under investigation for fraud and that its assets had been frozen. Analogizing to Andorran law, which Andbanc strangely believed to be similar to U.S. law, Andbanc concluded that the U.S. government would distribute Lake Shore's remaining assets to the defrauded investors in due course and that Andbanc need do nothing in the meantime to protect its entitlement to a share of the assets.

So matters stood when, on March 10, 2009, more than two years after Lake Shore's collapse, the receiver sent a notice to Lake Shore's creditors, including Andbanc, telling them they had to file a claim with the receiver within 45 days or be excluded from the distribution of the receivership's assets. The name and address to which the letter containing the notice was sent to Andbanc (via Federal Express) were the correct name and address but no employee of the bank was named as an addressee, presumably because the bank's name was the only name on Andbanc's account with Lake Shore.

In an affidavit submitted to the district court, signed by Santiago Mora Torres, the bank's chief investment officer, Andbanc denied having received the receiver's letter. The FedEx "Customer Support Trace" states that it was signed for by "C. Stamp" at the bank's address, but

the bank claims, plausibly enough, that no one by that name is employed by it. The customer-trace document, dated months later, states that no image of the signature on the receipt for the FedEx delivery is "currently" available; and none has turned up since.

Signatures acknowledging receipt of deliveries by FedEx often are unintelligible scribbles, so "C. Stamp" may be an inaccurate transcription of the signature of one of the bank's employees. Or maybe "C. Stamp" is an abbreviation for "Customer Stamp," indicating that the delivery was acknowledged by a stamp rather than by a signature—though it seems odd that an English-language abbreviation would be used in Andorra. We'll never know; and there is no evidence concerning Andbanc's procedures for internal delivery of the mail it receives. All that is reasonably clear is that, if Andbanc is telling the truth (as we must assume in the procedural posture of the case), the receiver's letter, whether or not received by the bank, did not come to the attention of any bank employee who would have recognized its significance.

There had been no further communication between the receiver and Andbanc when, in November 2009, deciding to divest itself of its share of Lake Shore's frozen assets, Andbanc employees searched the Internet for news about Lake Shore. They found the receiver's website, which had links captioned "Investor Notices" and "Receiver Reports and Documents." Andbanc doesn't deny having clicked on the links and read the notices, but it contends that the deadline for submitting claims wasn't mentioned in any of them. But Andbanc was

sufficiently concerned, upon learning of the receivership, to email the receiver its Lake Shore account statement and retain U.S. counsel. The receiver replied that Andbanc would not receive any share of the frozen assets unless it obtained the district judge's permission to file a late claim, as the deadline for filing claims had expired seven months earlier. Andbanc tried to obtain that permission but as we know failed.

The parties duel over the correct standard for determining whether Andbanc should have been allowed to file a late claim. The receiver's order said that late claimants would be barred "unless they can demonstrate to the [District] Court good cause for the delay, all reasonable diligence in submitting the information at the earliest possible date thereafter, and absence of any prejudice to the receivership estate." Yet, oddly, it is Andbanc that thinks that's the applicable standard and the receiver that argues that "excusable neglect," one of the grounds for vacating a final judgment under Fed. R. Civ. P. 60(b)(1), should apply instead. The oddity lies in the fact that "good cause" implies justification rather than excuse (negligence can be excused but not justified) and "any prejudice to the receivership estate" is a higher bar than prejudice sufficient to make neglect excusable. So the receiver's original standard was more favorable to it than the standard it is now urging, and less favorable to Andbanc yet embraced by Andbanc.

It might seem that in abandoning a standard more favorable to it than the one it is urging on us, the receiver was disserving the interests of the other claimants to the receivership estate and might be sued

by them for breach of fiduciary duty. 28 U.S.C. § 959; *Federal Savings & Loan Ins. Corp. v. PSL Realty Co.*, 630 F.2d 515, 521 (7th Cir. 1980); cf. *Fogel v. Zell*, 221 F.3d 955, 966 (7th Cir. 2000). But the receiver can't be criticized; we're about to see that the more lenient standard— "excusable neglect," rather than "good cause"—is clearly the correct one.

"Excusable neglect" was said in *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380 (1993), to have the same meaning in bankruptcy that it has in Rule 60(b)(1), which governs the vacation of ordinary civil judgments. See also *In re O'Brien Environmental Energy, Inc.*, 188 F.3d 116, 124-25 (3d Cir. 1999). Given the similarity between an insolvency receivership and a bankruptcy proceeding, see *Old Colony Trust Co. v. Medfield & Medway Street Ry.*, 102 N.E. 484, 487 (Mass. 1913); *Leonard Levin Co. v. Star Jewelry Co.*, 175 Atl. 651, 653 (R.I. 1934), and the infrequency of the former relative to the latter nowadays, it should mean the same thing in this case.

*Pioneer* describes "excusable neglect" as an "equitable" standard, one that requires the court to take "account of all relevant circumstances surrounding the party's omission . . . includ[ing] . . . the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." 507 U.S. at 395. But invariably when a court announces an "all relevant circumstances" standard to

govern some issue and then starts listing the circum-
stances, redundancy ensues; we think it a sufficient gloss
on "excusable neglect" that a judge asked to waive or
extend a deadline must evaluate the excuse offered by
the party seeking the waiver or extension and the conse-
quences to all persons affected by the granting or
denying of it. The stronger the excuse and the graver
the adverse consequences of rejecting it relative to the
adverse consequences to the opposing party if the
excuse is allowed, the more the balance leans toward
granting. See, e.g., *Mommaerts v. Hartford Life & Accident
Ins. Co.*, 472 F.3d 967 (7th Cir. 2007). This is essentially
the approach the district judge took, and because "excus-
able neglect" is vague and the finality of judgments
important, appellate review of a judge's denial of a
Rule 60(b) claim is deferential, *United States v. Golden
Elevator, Inc.*, 27 F.3d 301, 303 (7th Cir. 1994); *Utah ex rel.
Division of Forestry, Fire & State Lands v. United States*,
528 F.3d 712, 722-23 (10th Cir. 2008), as is appellate
review of denial of the equivalent claim in either a bank-
ruptcy proceeding, *Biesek v. Soo Line R.R.*, 440 F.3d 410,
412 (7th Cir. 2006); *In re Marinez*, 589 F.3d 772, 775-76
(5th Cir. 2009); *In re Racing Services, Inc.*, 571 F.3d 729, 731-
32 (8th Cir. 2009), or a receivership proceeding. *Callahan
v. Moneta Capital Corp., supra*, 415 F.3d at 120; *SEC v.
Hardy, supra*, 803 F.2d at 1037.

The judge said that Andbanc's failure to comply with
the 45-day deadline had been "flatly unreasonable and
can only be attributed to an utter lack of diligence given
what Mr. Mora . . . admits he knew in 2007 and Andbanc's
failure to take any reasonable steps to act on that knowl-

edge until late 2009." The judge added that Mora's "purported assumption that United States and Andorra substantive and procedural rules governing court proceedings are alike so he did not have to take any action (such as retaining counsel in the United States to verify his assumption) is equally mind boggling." In short, Andbanc did not have a good excuse, which is the first part of the test.

As to the second—the relative consequences, to plaintiff and defendant, of granting and of denying relief—the judge correctly observed that the harm to Andbanc would be considerable—the loss of $2.6 million. The judge added: "Because Andbanc precipitated its present pickle due to its own inaction, however, this factor does not help its cause." The judge was mistaken; she was confusing the strength of the excuse with the consequences of failing to allow it. But the mistake was not serious enough to invalidate her ruling.

Andbanc's loss would be gain to the other claimants, but there is an important asymmetry: no one doubts that Andbanc's claim would have been allowed had it been timely. The prejudice to the other claimants that is pertinent to an equitable determination is not the loss of a windfall that would have resulted from their receiving an increased share of Lake Shore's assets solely because an otherwise valid claim had been forfeited. Rather, as the district judge recognized, it is the delay that those claimants would have encountered, in receiving the money due them, if the receiver had to recompute their shares of the asset pool, which it would have to do

because it had not created a reserve adequate to cover Andbanc's share. No money had yet been distributed, but the proposed distribution order listed the amounts that each approved claimant would receive; if those amounts were reduced, some claimants would be bound to squawk, further prolonging the receivership proceeding.

The receiver might be thought to bear part of the blame for the failure of notice and the resulting delay in Andbanc's submission of its claim because according to Mora's affidavit the receiver sought from the National Futures Association, with which Andbanc was registered, contact information about Andbanc before sending the notice—and Andbanc is registered with the association under Mora's name. The receiver ought to have realized, Andbanc argues, that a letter addressed merely to the name of a company might not come to the attention of the responsible employee and that if it did not the company would lose millions of dollars. But the receiver's failure to address the notice to Mora was not culpable even if the receiver did ask the futures association for contact information (as apparently it did, for Mora produced an email from the receiver that says that the receiver got the address from the association). The receiver couldn't have known that Mora was the responsible employee on the Lake Shore account just because he was Andbanc's listed representative in the association's files.

Andbanc perversely insists that the issue is not the adequacy of the notice but the fact of nonreceipt. That

a notice does not arrive does not signify a breach of the duty of notice. The duty is to employ a method of notice that is reasonably calculated to reach the intended recipient, and sometimes entirely proper notice fails to do so. It's apparent from FedEx's customer-trace report that FedEx was given the correct address, so if the letter was not delivered the fault was either entirely FedEx's or mainly Andbanc's (and certainly not the receiver's) for having failed to name a contact person on its account with Lake Shore and to have adequate procedures for sorting mail received by it. It should at least have submitted evidence concerning its procedures for distributing its mail. *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 478-79 (7th Cir. 2009); *In re Longardner & Associates, Inc.*, 855 F.2d 455, 459 (7th Cir. 1988); *In re Williams*, 185 B.R. 598, 600 (9th Cir. BAP 1995).

An obvious case in which failure of receipt is not a failure of notice is where the recipient had given the notice giver the wrong address. But that is almost this case. By failing to list a person's name on its Lake Shore account statement (Andbanc accessed the statement on Lake Shore's website and probably expected all its communications with Lake Shore to be electronic), Andbanc increased the risk of nondelivery—not to Andbanc's headquarters but to the responsible employee within Andbanc, namely Mora.

The issue of delivery, which preoccupies the parties, is thus a red herring. Either FedEx delivered the receiver's letter to Andbanc, or it did not. All that matters is whether the failure to include Mora's name in the

address of the FedEx package was a breach of the receiver's duty to notify potential claimants to Lake Shore's assets; the district judge was entitled to conclude that it was not.

Andbanc's negligence went beyond the omission of Mora's name on the account statement. Its casual assumption, when it learned that Lake Shore's assets had been frozen, that it need do nothing in order to recover its share of the assets—an assumption based in part on the fantastic belief, for an Andorran bank to entertain, that Andorran and U.S. law coincide (the bank's Andorran lawyer must have known that Andorran law is a compound of French, Spanish, Catalan, and even ancient Roman law, A.H. Angelo, "Andorra: Introduction to a Customary Legal System," 14 *Am. J. Legal Hist.* 95 (1970))—is inexcusable. Andbanc is not the corner grocery in which to buy *cunillo*, *xai*, or *cocques*; it is a sophisticated financial enterprise and one would think that having learned that millions of dollars that it had invested in a commodity pool were frozen as a result of a criminal investigation, it would designate one of its financial officers to keep tabs on the matter.

Even if the prejudice to Andbanc of losing its entire claim—solely because of untimeliness, as there was no other objection to it—might exceed the inconvenience to the other parties of what might be only a slight delay in the receiver's recomputation of the relative shares and obtaining the judge's approval of the revised distribution order resulting from that recomputation, the balance is evened by the likelihood that the recomputa-

tion would stir a hornet's nest, the hornets being the hundreds of other creditors whose claims would have to be cut down to make room for Andbanc's. So we cannot say that the district judge "abused her discretion" (the rude expression for an appellate court's emphatic conviction that a trial judge's ruling was erroneous) in denying Andbanc's motion to be allowed to file a late claim.

A final twist is worth noting. After the district judge's decision approving the proposed allocation of the assets of the receivership estate, the receiver distributed the approved amounts to the other claimants but held back a reserve large enough to cover Andbanc's claim should Andbanc prevail on appeal. This was done at Andbanc's request, to prevent its appeal from being rendered moot by the dissolution of the estate. Were that reserve now to be handed over to Andbanc, the receiver would actually incur less expense than it would by mailing checks to the hundreds of claimants whose claims have been accepted and who therefore are entitled under the district judge's ruling to a pro rata share in whatever assets have not yet been distributed. Rarely, however, is a judgment that was correct on the basis of the then existing facts when entered by the trial court reversed on appeal because of events (other than a change in law) that occurred after judgment, though a case can become moot as a result of such events. *In re UAL Corp.*, 468 F.3d 456, 460 (7th Cir. 2006). Andbanc's procuring a reserve to protect its appeal after it lost in the district court would be a perverse basis for reversing that court. It would amount to pulling the rug out from under the court.

GAMAG's quarrel with the district court, to which we now turn, is unrelated to Andbanc's. GAMAG filed a timely claim for some $600,000. The receiver's distribution order gave it the same 39 percent share of the frozen assets as the other approved claimants got. But GAMAG insists that it should get 100 percent because it's a creditor of Lake Shore's commodity pools and the other claimants (or most of them) are mere shareholders; creditors are usually paid ahead of shareholders in insolvency proceedings, whether the proceedings take the form of bankruptcy, *Bank of America National Trust & Savings Ass'n v. 203 N. LaSalle Street Partnership*, 526 U.S. 434, 441-42, 444-45 (1999); *In re Wabash Valley Power Ass'n*, 72 F.3d 1305, 1313 (7th Cir. 1995); *In re Lett*, 632 F.3d 1216, 1220 n. 6 (11th Cir. 2011), or of receivership. *Louisville Trust Co. v. Louisville, New Albany & Chicago Ry.*, 174 U.S. 674, 683-84 (1899); *Northern Pacific Ry. v. Boyd*, 228 U.S. 482, 508 (1913); *SEC v. Enterprise Trust Co., supra.*, 559 F.3d at 653.

Lake Shore offered each investor in its commodity pools a choice between the investor's buying shares of the pools and having his investment placed in a separate "portfolio management account," consisting of a custodial account in the futures commission merchant in which Lake Shore deposited the investors' money. GAMAG chose the second arrangement and claims that having a portfolio management account entitled it to withdraw its investment (the amount of the withdrawal being computed from the current market value of the investment) from the futures commission merchant at will, whereas the investments of the shareholders

were commingled and a procedure established for redemption of their shares only after "notice" and only on a designated "Redemption Day." But actually GAMAG and the shareholders had essentially the same withdrawal rights: each could redeem its investment each week on Friday provided it gave notice Thursday. The only potentially significant difference was that a "portfolio management account" investment was to be held in a separate account. That wasn't done; GAMAG's investment was commingled with the investments of the shareholders.

Nevertheless the district judge rightly rejected GAMAG's claim to priority over the shareholder investors. GAMAG's investment, like theirs, was not directed by the investor, as GAMAG understood and agreed. All investment decisions were made by Lake Shore, and they were the same decisions for GAMAG as for the shareholders. GAMAG's expected gain (or loss) was identical to that of the other investors because the market value of its investment moved in tandem with that of the shareholders' investments, all the investments being treated as if pooled.

The priority that lenders enjoy in bankruptcy (and likewise in receiverships) over owners is a function of the difference in their relation to the enterprise. Lenders bear less risk because they have the first claim on the borrower's assets in the event of insolvency, and they pay for this by surrendering all upside risk to the borrower's owners (who in that way are compensated for bearing more downside risk than the creditors). The creditors' priority in bankruptcy mirrors the contractual

allocation of risk and reward between creditors and shareholders. Thomas H. Jackson, "Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors' Bargain," 91 *Yale L.J.* 857, 871 (1982). GAMAG's contract with Lake Shore was not intended to give it priority over its co-venturers. See *In re Telegroup, Inc.*, 281 F.3d 133, 142-43 (3d Cir. 2002). It had not agreed to accept a lower return on its investment in exchange for priority in the distribution of assets. See *In re SeaQuest Diving, LP*, 579 F.3d 411, 422-23 (5th Cir. 2009). It thus had not been "subjected to involuntary and uncompensated risk." *SEC v. Enterprise Trust Co.*, *supra*, 559 F.3d at 652; compare *In re American Wagering, Inc.*, 493 F.3d 1067, 1073 (9th Cir. 2007). And its loss would have been the same without the commingling, as it was just as easy for Lake Shore to steal from GAMAG's account as it was to steal from the pool.

The two orders challenged in these appeals are

AFFIRMED.