In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1375

GEORGE LAGEN, on behalf of himself
and all others similarly situated,

*Plaintiff-Appellant,*

*v.*

UNITED CONTINENTAL HOLDINGS, INC.,
and UNITED AIRLINES, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 4056 — **Harry D. Leinenweber**, *Judge.*

ARGUED SEPTEMBER 8, 2014 — DECIDED DECEMBER 22, 2014

Before WOOD, *Chief Judge*, and POSNER and HAMILTON,
*Circuit Judges.*

WOOD, *Chief Judge.* A person could be forgiven for think-
ing that a "lifetime" benefit that can vanish in an instant is
an oxymoron. George Lagen spotted the problem when
United Airlines canceled some of the "lifetime" benefits he
had earned after he reached the exalted status of "Million-

Mile Flyer" on the airline. United took this step following its merger with Continental Airlines. Lagen, a Million-Mile Flyer since 2006, responded with this lawsuit, in which he alleged that the reduction of benefits breached a contract governing Million-Mile Flyer rewards. The district court granted summary judgment for United, finding that there was no such contract between United and Lagen, apart from the general agreement that governs United's frequent flyer program. The general agreement, Lagen concedes, gives United the right to amend program benefits unilaterally whenever it chooses. Lagen has appealed, but we find no error in the district court's analysis, and so we affirm.

## I

MileagePlus, United's frequent flyer program, allows customers to collect rewards such as free flights and seat upgrades in exchange for patronizing United. The MileagePlus Program Rules (the Rules) govern the program. The Rules have always allowed United to change the terms of the MileagePlus program unilaterally and without notice. For example, the 1993 version of the Rules states that "United has the right to terminate the Program, or to change the Program Rules, regulations, benefits, conditions of participation, or mileage levels, in whole or in part, at any time with or without notice … . United may, among other things, withdraw, limit, modify, or cancel any award." More recent versions of the Rules contain essentially the same language. MileagePlus offers several Premier annual status levels, for which customers qualify based on yearly mileage.

In 1997 United went one step beyond the various Premier levels when it announced a new Million-Mile Flyer status in

its Friendly Skies Newsletter. This announcement reads in its entirety:

> New million-mile flyer reward. We are pleased to announce an unprecedented reward for our most loyal flyers: Lifetime Premier Executive status. Mileage Plus members who have earned a total of one million paid flight miles on United will retain the benefits and privileges of Premier Executive status for life, in recognition of their loyalty to United.

Lifetime Premier Executive status was very attractive. In 1997, MileagePlus included three annual status levels. Customers who had flown 50,000 miles in one year received so-called Premier Executive status (the middle level) for the next calendar year; as Premier Executives, they received program credit representing the miles they actually flew plus a 100% bonus on top of actual mileage. They also received higher priority for upgrades. United later added two annual regional upgrades and three one-time, system-wide upgrades to the Million-Mile Flyer benefit package.

After United merged with Continental, it changed the annual status levels: it added a fourth status and renamed the tiers (Silver, Gold, Platinum, and 1K). This necessitated the transition of the Million-Mile Flyers from the old Premier Executive status to the new system. United decided that the Premier Gold level was the proper equivalent, because it is the level that requires 50,000 miles. It is not, however, quite as good as the old Premier Executive: Gold is now the third-highest status rather than the middle one, and Gold customers receive only a 50% bonus on miles flown, not 100%. In addition, the new regime stripped away the regional and

system-wide upgrades that Million-Mile Flyers used to receive.

Lagen enrolled in MileagePlus in 1993 and became a Million-Mile Flyer in 2006. He says that United's Million-Mile Flyer benefits, which were explained to him by United's customer-service personnel, mailers, and advertisements beginning around 1997, induced him to switch his airline loyalty from British Airways. The record supports this assertion: Lagen had flown no more than 22,415 miles per year on United flights prior to 1997, but he flew approximately 100,000 miles per year with United for the next decade.

Lagen, it is fair to say, was infuriated by the changes United made after the merger to the Million-Mile Flyer program. As we noted, he turned to the courts for help in this diversity action for breach of contract. (He invokes the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A), which requires only minimal diversity.) He alleged that he and United had formed a contract through United's unilateral offer to give him lifetime benefits if he flew 1,000,000 miles on United flights and his acceptance of that offer by flying 1,000,000 miles. United breached this contract, Lagen charges, by materially reducing the lifetime benefits of Million-Mile Flyers. After the parties filed cross motions for summary judgment, the district court granted United's motion, finding that no rational trier of fact could conclude that United had a distinct Million-Mile Flyer program that was not part of MileagePlus. Since the MileagePlus Program Rules plainly allow United to reduce benefits on a whim, Lagen could not prevail.

**II**

We review a district court's grant of summary judgment *de novo*, construing all facts and reasonable inferences in favor of the nonmoving party. See *Huang v. Cont'l Cas. Co.*, 754 F.3d 447, 450 (7th Cir. 2014). The parties have assumed that Illinois law governs this action, and so will we. In Illinois as elsewhere, the first prerequisite to a successful breach of contract claim is an obvious one: there must be a contract between the parties. See *Zirp-Burnham, LLC v. E. Terrell Assocs., Inc.*, 826 N.E.2d 430, 439 (Ill. App. Ct. 2005). Lagen asserts that he and United are parties to an independent contract for Million-Mile Flyer benefits. United offered these lifetime benefits to any member of the public who flew 1,000,000 miles with United. Acceptance for this unilateral offer, Lagen reasons, occurs by performance. Lagen did just what United asked: he racked up the required miles. United counters that no such contract arose. Instead, it argues, the Million-Mile Flyer status is just another level of the MileagePlus program and it is governed by that program's rules.

Lagen points out that the MileagePlus Program Rules do not expressly mention Million-Mile Flyers. This omission, he asserts, demonstrates that Million-Mile Flyer benefits are not part of MileagePlus. United draws the opposite inference; it argues that the MileagePlus Program Rules do not mention Million-Mile Flyers because Million-Mile Flyer benefits are part and parcel of MileagePlus. Here is where Lagen begins to encounter shaky ground. He agrees that the annual status levels are part of MileagePlus, even though the versions of the Rules placed into evidence do not expressly mention the Premier program (in contrast to the current Rules). Thus, the fact that the Rules do not mention Million-Mile Flyers (or

status levels) is inconclusive at best. All it shows is that the Rules do not address every last detail of United's loyalty benefits.

Lagen's position weakens further when we look at the remainder of the evidence in the record. United advertisements indicate that only MileagePlus members are eligible to become Million-Mile Flyers. For example, the 1997 Friendly Skies Newsletter states that the "[n]ew million-mile flyer reward" is for "Mileage Plus members." An email congratulating new Million-Mile Flyers lists "United Mileage Plus" as the sender and refers to MileagePlus terms and conditions. United's website places information about Million-Mile Flyer benefits under the umbrella of MileagePlus, and a customer's status as a Million-Mile Flyer is noted on her MileagePlus member card.

Lagen has not submitted any evidence that would support a conclusion that Million-Mile Flyer benefits are separate from MileagePlus. This leaves us with a record pointing in only one direction: Million-Mile Flyer status is a benefit that United introduced in 1997 as part of the existing MileagePlus program. Because Lagen cannot show that United made him an offer to enter into a contract separate from the arrangement governing MileagePlus, Lagen cannot show a breach of any such contract. Nor can he show a breach of the MileagePlus Program Rules, because they have always allowed United to tinker with all details of the program.

We close with a word about the common-sense argument that Lagen presents and our dissenting colleague emphasizes: that United must be accountable under some body of law because its representation that it was bestowing "lifetime" benefits on its Million-Mile flyers is irreconcilable with its

reserved right under the MileagePlus Program Rules to modify and cancel those benefits at any time. This point does not depend on the existence of a separate contract for Million-Mile Flyer benefits. Instead, Lagen argues, it illustrates United's misleading—perhaps even fraudulent—advertising practices. Unfortunately for Lagen, this argument runs squarely into the Airline Deregulation Act of 1978 (ADA), 49 U.S.C. § 41713, which preempts any claim based on violations of state consumer protection law. See *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 228 (1995) (the ADA preempts claims under the Illinois Consumer Fraud and Deceptive Business Practices Act related to frequent flyer programs). See also *Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422, 1432 (2014) (claim for breach of state-imposed covenant of good faith and fair dealing is preempted); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378, 391 (1992) (the ADA "pre-empts the States from prohibiting allegedly deceptive airline fare advertisements through enforcement of their general consumer protection statutes"). Naturally, the ADA "does not give the airlines *carte blanche* to lie to and deceive consumers." *Morales*, 504 U.S. at 390. What it does do, however, is channel grievances of this type to the Department of Transportation, which is authorized to regulate such activities. See *id.* at 391. That may not be as satisfying as a private right of action for the disappointed consumer, but that is the choice Congress made.

Lagen was probably not the only customer to feel betrayed by United's unilateral reduction of the benefits it gives to Million-Mile flyers. But the question before us is whether it is possible to address that betrayal through the use of unilateral contract theory, and thereby avoid the preemption rule of *Wolens*, *Morales*, and *Ginsberg*. In our

view, the answer is no. Courts could always re-characterize advertisements and promotions as unilateral offers; there is nothing in principle that separates United's "lifetime benefits" from other airlines' ads relating to, say, increased leg room or quicker boarding for loyal customers. If we were to sanction the transformation of consumer fraud claims into contract disputes in this way, we would fatally undermine the statutory scheme, which dictates that consumer fraud cases must be handled through the Department of Transportation. However bad United's conduct may have been, it must be addressed in the manner that Congress prescribed.

## III

Lagen has not raised a genuine issue of material fact over the question whether United made him an offer to form a contract for a Million-Mile Flyer program that is separate from MileagePlus. We therefore AFFIRM the judgment of the district court.

HAMILTON, *Circuit Judge*, dissenting. United's defense here is that the airline's *very best* customers—its Million Mile Flyers—should have known better than to believe United's promise of "lifetime" benefits. This defense amounts to a confession of consumer fraud. United could not—honestly and legally—promise "lifetime" benefits while reserving the right to cancel its promise at any time and for any reason. While federal law protects airlines from state consumer fraud laws, our court should not, as a matter of contract law, endorse this deception. I respectfully dissent.

United ran its frequent flyer program, MileagePlus, subject to a reservation of rights. It could change or cancel the benefits at any time for any reason. That reservation of rights may be enforceable as applied to most benefits. But then in 1997, United invited its frequent flyers to aim higher, to seek "lifetime" benefits as Million Mile Flyers: "Lifetime Premier Executive status."

Plaintiff Lagen flies a lot. He read the offer and started flying primarily on United. By 2006, he reached one million miles and qualified for United's promised "lifetime" benefits. United congratulated him warmly, and he enjoyed those benefits for several years. But in 2010, in connection with its merger with Continental Airlines, United changed its Million Mile Flyer program in ways that Lagen contends have diminished the rewards he had been promised.

We should reverse summary judgment for United. This case presents a simple example of what the law calls either an option contract (in the Restatement (Second) of Contracts) or a unilateral contract (in the first Restatement of Contracts). An offer of benefits was made. It was intended to invite acceptance by conduct, and acceptance by conduct is

sufficient to form a binding contract. See, e.g., Restatement (Second) of Contracts § 45 (1981) ("Where an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created when the offeree tenders or begins the invited performance or tenders a beginning of it."); Restatement (First) of Contracts § 45 (1932) ("If an offer for a unilateral contract is made, and part of the consideration requested in the offer is given or tendered by the offeree in response thereto, the offeror is bound by a contract … .").

The facts here show the creation of such an option contract. United offered "lifetime" benefits for customers who bought enough tickets to add up to a million miles of travel. Lagen saw the offer and switched from another airline to United. His commitment to United, i.e., his performance that United had invited with its offer, was substantial. It took him nearly ten years and hundreds of thousands of dollars' worth of United flights to accumulate the one million miles. Lagen thus accepted the offer by his conduct.

He contends United then breached the contract that was created. His theory of contract creation is correct, so this lawsuit should focus on whether and to what extent the changes in United's "lifetime" benefits for Million Mile Flyers have harmed Lagen and others in the class he seeks to represent.

To avoid these basics of contract law, United relies on the reservation of rights clause in its broader MileagePlus program documents. It argues that Lagen's status as a Million Mile Flyer is merely one "status" under the broader MileagePlus program. By its reasoning, the airline invokes its right to change those "lifetime" benefits at any time and for

any reason, including cancelling them altogether. United admitted as much in oral argument.

This is legal sophistry in defense of consumer fraud. Contract law, however, provides a simple rebuttal. United's promise of lifetime benefits was obviously inconsistent with its earlier reservation of rights. The later promise, which was intended to and did induce reliance and acceptance by conduct, should trump the earlier reservation of rights by modifying the contract. See generally *Orth v. Wisconsin State Employees Union Council 24*, 546 F.3d 868, 872 (7th Cir. 2008) (contract can be modified by subsequent dealings giving rise to inference of agreement to modify it); *In re UAL Corp.*, 468 F.3d 456, 459 (7th Cir. 2006) (United was free to agree with union to modify contract); *Operating Engineers Local 139 Health Benefit Fund v. Gustafson Construction Corp.*, 258 F.3d 645, 649 (7th Cir. 2001) (under general common law principles, contract modification requires only consideration and acceptance manifested with sufficient clarity). Lagen provided consideration for the modification by spending so much money and flying so many miles on United, *just as United hoped he would*. At the very least, a jury could find that a reasonable customer would understand United to have meant lifetime when it said "lifetime" and thus to have modified the terms of its MileagePlus program accordingly.

It's possible, of course, that United simply made an illusory promise, as it argues in court, and that its customers should have understood it was making only a false promise. But that argument depends on a factual premise that supports conflicting inferences, so United is not entitled to summary judgment.

Two elementary legal principles frame the factual dispute. The first supports plaintiff Lagen. It's the "elementary principle that where a party publishes an offer to the world and before it is withdrawn another acts upon it, the party making the offer is bound to perform his promise." *Weather-Gard Indus., Inc. v. Fairfield Sav. & Loan Ass'n*, 248 N.E.2d 794, 798 (Ill. App. 1969), citing Restatement (First) of Contracts § 45. The second, urged by United, is that representations made "without intent to create legal relations" do not constitute an offer. *McCarty v. Verson Allsteel Press Co.*, 411 N.E.2d 936, 943 (Ill. App. 1980), quoting Corbin on Contracts § 11 (1950).

Which principle controls here does not depend on United's subjective intent. Contract law depends not on private and unexpressed intentions but on objective expressions of intent and agreement. E.g., *Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989). The factual question here is whether, under all the circumstances, a reasonable person in Lagen's position would have understood that United intended to offer lifetime benefits or instead had reserved the right to change its mind and was offering nothing. *Kolodziej v. Mason*, — F.3d —, —, No. 14-10644, slip op. at 9–11 (11th Cir. Dec. 18, 2014) (applying totality of circumstances test to decide whether defendant made serious offer for option or unilateral contract).

A real promise of benefits, an offer, is "an act that leads the offeree," in this case Lagen, "reasonably to believe that a power to create a contract is conferred upon him." *McCarty*, 411 N.E.2d at 943, quoting Corbin on Contracts § 11. United's view is that no one in Lagen's position could have reasonably believed that the Million Mile Flyer promise was really

an offer to create a contract because any reasonable person should have realized that the Million Mile Flyer promise was subject to the reservation of rights in the MileagePlus program. The majority endorses this view, seeing the factual record as "pointing in only one direction." But the evidence the majority cites is not overwhelming. Ample evidence supports a different inference.

The best facts for United are these: Only MileagePlus members can qualify as Million Mile Flyers. A congratulatory email to new Million Mile Flyers is sent from a "United Mileage Plus" email address. Information about the Million Mile Flyer program is found under the MileagePlus umbrella on the United website. Lagen's Million Mile Flyer status was noted on his MileagePlus member card.

Perhaps those sparse facts might have led a legally sophisticated or hyper-vigilant customer to think that United was not serious when it promised "lifetime" benefits. But the legal test is how a reasonable customer would have interpreted the Million Mile Flyer promise in light of all the circumstances.

The most basic and powerful fact is the plain meaning of the word United chose to attract plaintiff's business: "lifetime." That's hard to reconcile with "until we change our minds." Another key fact is that none of the Million Mile Flyer offers seem to have included even any warning asterisk and fine print telling readers that the airline did not actually mean "lifetime." (This fact distinguishes this case from a classic illustration of an illusory promise cited in the Restatement (Second). In *Spooner v. Reserve Life Ins. Co.*, 287 P.2d 735, 738 (Wash. 1955), a bulletin announcing a yearly bonus system for employees could not be construed as an offer for

an option contract when that same bulletin also told the employees "in plain English that the company could withhold or decrease the bonus, with or without notice.")

Also critical to the understanding of United's offer are the importance of an airline's loyalty program, the importance of its best customers, and the fact that one could earn Million Mile Flyer status only by spending many years and a great deal of money flying on United. This was an offer designed to attract the best potential customers to shift a high volume of their purchases to United. All of these facts make this case easy to distinguish from the majority's concerns about a slippery slope leading to lawsuits about vague advertising promises of more legroom or priority boarding.

And it's not as if United's promise was like that of a fly-by-night carnival barker offering eternal happiness to anyone who can knock over the bottles. United is a large and seemingly respectable business with a legal staff that presumably reviews such marketing promises. It could be expected to level with its customers, or least to refrain from deliberately misleading them with a false promise of "lifetime" benefits.

The majority and I agree that some extravagant promises are not meant seriously as contract offers. A recent decision by the Eleventh Circuit provides an example that makes for a useful comparison. In *Kolodziej v. Mason*, — F.3d —, No. 14-10644 (11th Cir. Dec. 18, 2014), a lawyer in a high-profile murder case made an off-the-cuff statement in a television interview: if someone could disprove his client's alibi, "I'll pay them a million dollars." A law student took up the challenge, claimed to have satisfied it, and demanded his million dollars. The lawyer refused to pay. The Eleventh Circuit af-

firmed summary judgment for the lawyer, applying the same standard of objective reasonableness discussed here. The court found that "I'll pay them a million dollars" was just off‑the‑cuff and colloquial hyperbole, a figure of speech to attack the prosecution's theory rather than a serious offer of a contract. — F.3d at —.

The facts here are of course quite different. United's offer of lifetime benefits was not at all off‑the‑cuff or a figure of speech. Nor is a lifetime benefit exaggerated or unreasonable for a customer who has flown a million miles on one airline. Based on the facts here, a jury could find that a customer— even one conscious of the reservation of rights in the more general MileagePlus program—could reasonably conclude that United's offer of lifetime benefits to its best and most loyal customers was actually intended to provide them with lifetime benefits.

In most businesses, consumers victimized by the shabby tactics United has embraced can turn to their states' consumer protection statutes. Airlines are different. The Airline Deregulation Act of 1978 preempts claims under state consumer protection laws. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992). Part of the balance struck by that Act, though, is that it allows customers to sue airlines for breach of contracts, to enforce commitments that airlines have undertaken voluntarily. *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 230–33 (1995). That's what we should do here. But if courts are not willing to hold airlines to the commitments they make, then loyal customers like Lagen must either make enough noise to get the attention of United's management (perhaps CEO Jeff Smisek or General Counsel Brett

Hart) or turn to the United States Department of Transportation for relief.

United could have defended this lawsuit honorably. It could have tried to show that it has in fact fulfilled its promise to plaintiff and other Million Mile Flyers. For now, however, we should reject the defense that the promise was meaningless. We should reverse summary judgment in favor of United and allow plaintiff to pursue his claims in the district court.